UNITED STATES of America, Appellee,

v.

**William LaMORTE, also known as "Bunky", Defendant–Appellant.**

**No. 102, Docket 91–1163.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1991.

Decided Nov. 15, 1991.

---

Herald Price Fahringer (Diarmud White, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, New York City), for appellant.

Martin Klotz, Sp. Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Theodore E. Chervin and Samuel W. Seymour, Asst. U.S. Attys., New York City), for appellee.

Before CARDAMONE, WALKER, and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge:

William "Bunky" LaMorte was convicted, following a jury trial, of one count of conspiring to import marijuana in violation of 21 U.S.C. § 846 (1988) and one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (1988). District Judge David N. Edelstein sentenced LaMorte to 50 years imprisonment without parole and fined him $49,-200,000. In a subsequent forfeiture proceeding, the defendant was ordered to surrender an additional $25,000,000 in cash and property. This appeal followed.

### The Facts

At trial, the government asserted that William LaMorte headed a large and profitable marijuana importing organization that was responsible for bringing nearly 120 tons of the drug into the country since 1970. Several members of LaMorte's organization, including his brother Thomas, deck hands, off-loaders, boat captains, distributors, and suppliers testified for the government. Their statements provided a detailed picture of LaMorte's global importing network.

Specifically, Thomas LaMorte and Steve Garrison, the captain of several boats used by William LaMorte to import marijuana, testified that between 1970 and 1977, LaMorte organized the importation of vast quantities of marijuana from Jamaica, Colombia, and Morocco. In some of these transactions, LaMorte, aboard his boat the *Mary Poppins*, personally ferried marijuana from an offshore tanker to his Southold, New York estate. Thomas LaMorte also testified that in 1977, the defendant began operating on a new front, importing hashish from Lebanon.

By 1981, William LaMorte, apparently dissatisfied with the quality of the Lebanese drugs, launched a scheme to import boat loads of marijuana from Thailand. Leland Dart, Phillip Christensen, and John Corman, who helped organize and finance the Thai scheme, each provided substantial and consistent testimony regarding LaMorte's role. Christensen and Corman described a meeting they attended with LaMorte at Albert Ellis' house in Virginia in October, 1983, at which LaMorte produced a ledger detailing the different grades and prices of the Thai marijuana and complained that the marijuana was not selling well because it was moldy. The Thai scheme ended on April 9, 1985, when the United States Customs Service and the Coast Guard seized a fishing trawler, the *Oregon Beaver*, laden with 22 tons of Thai marijuana off the coast of San Francisco.

LaMorte presented two principal defenses. First, he argued that the governments' witnesses were incredible and intimated that the entire case against him had been concocted. He pointed out that the testimony against him was purchased with reduced sentences, while he faced a long prison term. In his summation, LaMorte linked the prosecutor, by name, to this purported fabrication:

Bill LaMorte sits in this courtroom because the government went out and called these people. They brought up Bill LaMorte's name, they suggested Bill LaMorte's name to these witnesses. These witnesses were not talking about Bill LaMorte until the government went to them and made deals with them to come in here and talk about Bill LaMorte. So don't let [the Assistant U.S. Attorney] disavow himself or distance himself from these witnesses, because that's exactly the way all of them walked into the courtroom.

In response to this allegation that the government had scripted the testimony against LaMorte, the government in its rebuttal summation made detailed reference to the evidence in the case. The government pointed out that witnesses who had not spoken in years corroborated important parts of each others stories. The government also noted that some inconsistencies in the witnesses' testimony remained and suggested that if the government was framing LaMorte, surely it would have done a better job. The attack on LaMorte's defense culminated with a series of rhetorical questions suggesting the inherent improbability of his claim:

Ask yourself, why would these witnesses and why would the government seek to frame the defendant? You don't think the government is busy enough prosecuting crimes? You don't think the government is busy enough prosecuting crimes that it has the time to be prosecuting innocent people, going after people arbitrarily? I think I'll go after this guy today?

At this juncture, LaMorte objected to the government's suggestion that it did not prosecute innocent people. The court overruled the objection, the government moved on to other matters, and LaMorte did not request a curative instruction.

In some conflict with his theory that the government had created its case against him out of whole cloth, LaMorte's second defense was that if he had been in the drug smuggling business, he had withdrawn from the conspiracy by late September, 1984, so that the five year statute of limitations had run when the government filed its indictment on September 28, 1989. In support of this defense, LaMorte elicited from Leland Dart, one of his colleagues in the Thailand operation, that co-conspirator Albert Ellis told Dart in 1983 that LaMorte

was "out of the business." Another conspirator, Phillip Christensen, testified that Ellis told him in July, 1984 that LaMorte didn't want to invest any more and wanted only to be paid back the investment he had made and that LaMorte was sick and wanted to retire from the business.

The government countered this defense with testimony that as late as December, 1984, Ellis assured Christensen and John Corman that LaMorte would be responsible for selling the Thai marijuana once it reached the United States. The government also presented evidence of a meeting in late 1984 or early 1985 between LaMorte and Stephen Garrison at which LaMorte assured Garrison that LaMorte was arranging a further shipment of marijuana from Thailand. This was the shipment that Customs intercepted on April 9, 1985, and triggered the investigation leading to the indictment in this case.

The jury deliberated for six days without reaching a verdict, twice declaring itself deadlocked. On the seventh day, Judge Edelstein administered an *Allen* charge and shortly thereafter the jury returned a guilty verdict on both counts.

### Discussion

LaMorte raises two principal objections on this appeal. First, LaMorte asserts that the prosecutor's suggestion that the government is too busy to prosecute innocent people so prejudiced his cause as to deny him a fair trial. Second, LaMorte claims that the district court's instruction on withdrawal from the conspiracy, coupled with the government's prejudicial argument in response to this defense in summation, denied LaMorte the opportunity to effectively present the defense.

### 1. Prosecutorial Misconduct

■ In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial. *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir.), *cert.*

*denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986). This determination depends heavily on the context of the case, *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir.1990), and is largely controlled by three factors: (1) the severity of the misconduct; (2) curative measures taken by the district court; and (3) the certainty of conviction absent the misconduct. *Id.; United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

■ The prosecutor's statement that "[y]ou don't think the government is busy enough prosecuting crimes that it has the time to be prosecuting innocent people, going after people arbitrarily?" was improper. The principal reason that prosecutors must not make personal observations about the guilt of the defendant is that such an observation can create an inference in the mind of the jury that the prosecutor has knowledge of extra-record evidence proving that the defendant is, in fact, guilty. *United States v. Young*, 470 U.S. at 18, 105 S.Ct. at 1047. A prosecutor's assertion that the defendant is guilty also raises the risk that the jury will simply defer to the government's view of the evidence. *Id.* at 19, 105 S.Ct. at 1048.

■ Even though the prosecutor's statement was improper, reversal is not warranted here, despite the court's failure to sustain LaMorte's objection and give a curative instruction, since the misconduct was *de minimis* in the context of this case. *U.S. v. Nersesian*, 824 F.2d 1294, 1329 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). In this case, "[w]hen viewed in context, the prosecutor's remarks cannot be read as implying that the prosecutor had access to evidence outside the record." *Young*, 470 U.S. at 19, 105 S.Ct. at 1048. Rather, the statement, coming in direct response to LaMorte's suggestion that the prosecutor had induced witnesses to invent testimony against LaMorte, is best understood as ridiculing the notion that the government had arbitrarily constructed a massive case against him out

of thin air. Further, the overwhelming evidence of pre-statute of limitations criminality, to which the prosecutor's challenged remarks were addressed, "eliminates any lingering doubt that the prosecutor's remarks ... exploited the Government's prestige in the eyes of the jury." *Id.* This is true notwithstanding our view that, because evidence on the separate withdrawal question was close, we cannot conclude that LaMorte's conviction was certain. Since there was virtually no likelihood that absent the questioned statement the jury would have accepted LaMorte's "fabrication" defense, we conclude that this prosecutorial excess did not deny LaMorte a fair trial.

### 2. Jury Instruction

■ LaMorte finds error in the district court's instruction on withdrawal. At the charge conference, the district court informed the parties that LaMorte had presented sufficient evidence to warrant charging the jury on the defense of abandonment and that the court intended to charge the jury as follows:

A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy. In other words, the defendant must have taken some type of positive action to disavow or defeat the purpose of the conspiracy.

For example, a defendant may withdraw from a conspiracy by giving timely warning to appropriate law enforcement officers or authorities; by making efforts to prevent the commission of the crime that is the object of the conspiracy; by wholly depriving his prior efforts or [sic—"of"?] effectiveness in the commission of the crime; or by doing acts which are inconsistent with the objective of the conspiracy and making reasonable efforts to communicate those acts to his co-conspirators.

LaMorte objected on the ground that only the last example was applicable to his defense and that adding the other exam-ples would only confuse the jury. The court rejected this objection.

It is well settled that "a criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." *United States v. Durham,* 825 F.2d 716, 718–19 (2d Cir. 1987). Since there was some testimony from which it could be inferred that La-Morte withdrew from the conspiracy in 1984, LaMorte was, as the district court concluded, entitled to a jury instruction on withdrawal.

■ However, LaMorte is "not necessarily entitled to have the exact language of the charge [he] submitted to the district court read to the jury." *Id.* at 719; *United States v. Dyman,* 739 F.2d 762, 770–71 (2d Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). Rather, it is enough for the court's charge to indicate clearly to the jury the defendant's theory of the case and that the theory, if believed, justifies acquittal. *See United States v. Alfonso–Perez,* 535 F.2d 1362, 1365 (2d Cir. 1976). In short, the judge's charge must "adequately apprise[ ] the jury of the elements of the crime charged and their defense." *Durham,* 825 F.2d at 719.

Here, we have no doubt that the district court's charge adequately informed the jury of defendant's theory of withdrawal. Indeed, the charge contained within it, as one of several alternative examples, the precise theory of withdrawal that defendant espoused, that he could withdraw "by doing acts which are inconsistent with the objective of the conspiracy and making reasonable efforts to communicate those acts to his co-conspirators." Further, the defense alerted the jury to this portion of the charge by stressing in summation that "the defense position is extremely simple. Mr. LaMorte quit participating, ended his participation in any illegal activities and he communicated that to his co-conspirators, that's it." Certainly, it is preferable for the district courts to avoid the possibility of confusion by not providing the jury with alternative examples incompatible with the

defense theory. Nonetheless, the charge adequately apprised the jury of the defense theory, and we can not conclude that the charge was so confusing as to warrant reversal.

LaMorte argues further that the confusion resulting from deficiencies in the charge was exacerbated by the prosecutor's use in summation of the following analogy:

Suppose you had a group of people who were going to blow up a plane maybe to collect the insurance money on somebody in it and they all got together and they built a time bomb and they set the bomb to go off twelve hours in the future or a day in the future or two days in the future or whatever and he then put the bomb on the plane and then the people who did it all left and went back to their houses and did whatever they were going to do.

If the bomb goes off, as a defendant, you don't get to say "Hey, I'm not responsible, I wasn't there when the bomb went off."

You don't get to say "I'm not responsible, I got second thoughts after we put the bomb on the plane."

You establish the defense of withdrawal by doing something to diffuse the bomb; telling the authorities, going back and pulling the plug itself, doing whatever you have to do.

LaMorte responded in his summation by focusing precisely on the requirements for establishing the withdrawal defense:

[T]he defense position is extremely simple. Mr. LaMorte quit participating, ended his participation in any illegal activities and he communicated that to his coconspirators, that's it.

And we suggest that that's enough to show disavowal of the purposes of the conspiracy with communication is enough to show withdrawal.

We agree that the prosecutor's use of the time bomb metaphor was, in the abstract, somewhat inflammatory and misleading. Nonetheless, "[t]he government is not barred from using rhetorical devices during the trial." *United States v. Bia-*

*succi*, 786 F.2d at 513. We conclude that, viewed in context, the statement did not prejudice LaMorte's cause.

LaMorte does not contend that the time bomb metaphor improperly suggested to the jury that LaMorte was involved in uncharged violent crimes. Indeed, the government in summation expressly disclaimed any such inference. Rather, LaMorte argues that this metaphor confused the jury on the legal standard for withdrawal from a conspiracy. However, the government acknowledged in summation that "a defendant can announce to all the conspirators his lack of future participation and make certain that they all understand that he is no longer part of the conspiracy." Thus, far from portraying the "time bomb" example as the exclusive way to withdraw from a conspiracy, the government fully apprised the jury that if it accepted the defense's theory of the facts, then LaMorte was entitled to acquittal. While the government might have chosen a better metaphor, we can not conclude that the government's invocation of the time bomb analogy denied LaMorte a fair trial.

We have considered the remainder of LaMorte's objections and find them to be without merit. Accordingly, the decision of the district court is affirmed.