UNITED STATES of America, Appellee,

v.

Miguel SOTO and Luisa Cespedes, Defendants,

Pedro Pena also known as Johnny, Defendant–Appellant.

No. 400, Docket 94–1021.

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1994.

Decided Feb. 10, 1995.

S. Michael Weisberg, New York City, for defendant-appellant.

Lisa M. Fleischman, Asst. U.S. Atty. E.D.N.Y., Brooklyn, NY (Zachary Carter, U.S. Atty. and Peter A. Norling, Asst. U.S. Atty., on the brief) for appellee.

Before: OAKES, ALTIMARI, and WALKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Pedro Pena appeals his conviction, after a jury trial (Johnson, *J.*), of conspiring to bribe, and bribery of, a United States Customs official in violation of 18 U.S.C. §§ 371 and 201(b)(1)(C). Pena was

sentenced to a term of imprisonment of 24 months, a supervised release term of three years, restitution in the amount of $73,700 and a $100 special assessment.

Cespedes imported Dominican rum for sale in this country. Pena, a 42 year old salesman, worked for several grocery businesses in the years preceding the investigation. During a stint with Goya Foods he was named salesman of the year in two consecutive years. He later became a partner in another business that dealt with supermarket products. As a result of his job with Goya he met Cespedes and agreed to start a new venture with her. Cespedes's efforts to find a contact to help her illegally import rum triggered an undercover investigation.

Customs Service special agent John Cianci pretended to be a corrupt Customs official. A private customs broker informed Soto that Cianci could help the conspirators get rum through Customs illegally. Before Cianci was contacted by the conspirators, the conspirators left a phone number at the office of the private customs broker whose information led to the investigation. An agent of the Customs Service called the phone number several times; each time a man named Johnny answered the telephone. Pena was also known as Johnny.

In April 1993, Cianci was contacted through a beeper whose telephone number had been given to Soto. When Cianci returned the phone call, Soto answered the phone. Cianci identified himself as "the Customs person." Soto offered Cianci $5,000 to stamp documents authorizing the release of Soto's Dominican rum. On April 29, 1993, Soto and Cespedes met the undercover agent at a Sheepshead Bay, Brooklyn diner. At that point, Cianci told them that he needed to think about the offer that Soto had reiterated. Two weeks later, Soto and Cespedes again met the agent at the diner. In exchange for $3,000 in cash, Cianci stamped their documents with an official Customs stamp.

On May 19, Pena and Cespedes met Cianci in the diner parking lot. The agent stamped the conspirators' documents in the parking lot and received $3,000 in a plain envelope. A surveillance photo shows Pena looking over Cianci's shoulder during the stamping. At that meeting, Cianci mentioned that he was worried about being out of the office for too long. During a subsequent phone conversation with Pena, the agent again confided that he was afraid that he would "get in trouble at work." Pena offered to "take care of that next time."

Less than a week later, Cianci met the conspirators in the same parking lot for the same purpose. During the meeting, Pena talked to the agent about the business. He commented that "[m]ost people ... they don't pay taxes, they don't pay anything you know." Pena also assured Cianci that he was "gonna make a lot of money." Cianci told Pena he wasn't the only "customer," to which Pena responded "I ... understand." Having completed two successful meetings, Soto and Cianci spoke by phone again. Soto instructed the agent to deal with Pena if Soto were unavailable.

Following the diner meetings, agents watched the conspirators drive to an intersection near Kennedy Airport. The driver of the conspirators' car signalled a white truck to follow the vehicle into the airport where it was loaded with cartons from the premises of the common carrier that was holding the rum. The truck then proceeded to a warehouse in Newark, New Jersey. On June 4, Pena, Cespedes and Soto were arrested at the Newark warehouse. Ultimately, Cianci received $15,000 and stamped documents permitting 1340 cases of rum to enter the country illegally. Almost $75,000 in taxes would have been owed on such a quantity.

During the investigation Cianci wore undistinguished dark blue uniform pants and a civilian windbreaker. Although Cianci wore a uniform shirt with Customs Service emblems on the shoulders, the shirt was concealed under the nondescript windbreaker at least some of the time. However, the agent also wore a gold Customs inspection badge above his left shirt pocket. The testimony at trial established that, at least on some occasions, Cianci left his jacket unzipped so that the badge was visible. Furthermore, the agent testified that he had to open his windbreaker in order to reach into his shirt pock-

et to get the stamp he used on the documents.

At trial, Pena claimed that he believed that the business was a legitimate concern that would sell grocery items like the ones he had experience with, as well as imported rum. Further, he had left the business only three weeks after the conspirators occupied the warehouse because of a fight with Cespedes. Pena insists that he did not know that Cianci was from the Customs Service. Testifying in Pena's defense, Soto swore that he had never told Pena who Cianci was. Pena allegedly believed the agent was a private customs broker who retrieved the rum from Customs for Cespedes.

Despite his falling out with Cespedes, Pena had continued to visit the Newark warehouse during the time in question. He explained at trial that he attended the parking lot meetings in his capacity as Cespedes's translator or driver, and that he did so because Soto had asked him to, and because he was anxious to maintain good relations with Cespedes since they were jointly indebted. He testified that he neither saw nor knew the content of the papers that Cespedes gave to the undercover agent. Pena admitted, though, that he suspected that the white envelopes given to Cianci contained money.

Pena was convicted of one count of conspiracy to bribe a public official and one count of bribery. Prior to sentencing, Pena's counsel addressed himself to his client's minor role in the conspiracy. Pointing out that Pena had not benefitted from the crime, his attorney informed the court that Pena had no money and was about to file for bankruptcy. The district court then sentenced Pena to two concurrent 24–month terms of imprisonment and two concurrent three-year terms of supervised release. In addition, the district court directed Pena to pay $73,700, the amount of lost tax revenue, in restitution to the United States Customs Service. After Pena was sentenced the government noted that Pena's home, which provided the security for his bail bond, had been foreclosed upon. Pena now appeals.

We address three of Pena's arguments. He challenges the sufficiency of the evidence. Pena also urges that the district court failed to consider his financial resources before ordering him to make restitution. Finally, Pena insists that any restitution order ought to create joint and several liability with Soto.

## DISCUSSION

### A. Sufficiency of the Evidence

■ A defendant who claims that the evidence was not sufficient to sustain a conviction bears a " 'very heavy burden.' " *United States v. Brewer*, 36 F.3d 266, 268 (2d Cir. 1994) (quoting *United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir.1993) (quoting *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992)). In order to overturn a conviction on this ground, after viewing the evidence in the light most favorable to the United States and drawing all reasonable inferences and resolving all issues of credibility in favor of the government, this Court must conclude that "no 'rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.' " *Brewer*, 36 F.3d at 268 (quoting *United States v. Jones*, 16 F.3d 487, 490 (2d Cir.1994) (citation omitted)).

■ Pena challenges his convictions on both counts, insisting that no rational jury could have found that he either knowingly conspired to bribe, or knowingly bribed, a public official. His argument is that, because Cianci neither informed Pena that he was a Customs agent, nor wore conspicuous Customs Service identification, the jury could not have inferred that Pena knew Cianci was a public official.

Viewing the evidence, as we must, in the light most favorable to the prosecution, we reject this contention. A rational jury could have found that Pena knew that Cianci was a Customs agent. Cianci stamped documents in front of Pena on two occasions. He did so with an official stamp, leaving the documents imprinted with the agency's official authorization and his own badge number. The jury had before it a photograph showing the defendant looking over Cianci's shoulder while he was stamping documents. Moreover, Cianci's testimony established that his jacket

was open on some occasions, and that he had to open it to reach the stamp. A jury could reasonably have inferred that Pena saw the agent's uniform.

Other circumstances, viewed in their totality, also support an inference that Pena knew Cianci was a customs agent. An experienced businessman like Pena, who had been not only a salesman but a partner in a small business, would surely have questioned the need to bribe, or deal furtively with, a legitimate business contact. We believe that a jury reasonably could have inferred knowledge on Pena's part from his presence at times when Cianci was actually being bribed by two people who clearly knew that he was a public official. Further, in view of Soto's uncontested knowledge of the nature of the transaction, his direction that the agent deal with Pena in his absence could clearly give rise to a fair inference that Pena knew Cianci was a Customs agent.

Finally, Pena's conversations with Cianci were inculpatory. He did not question a private customs broker who said he was afraid of "getting in trouble" at work for an ostensibly legitimate transaction. He assured Cianci that he would make lots of money and that he "understood" that the conspirators were not the only customers. And he noted that "most people" imported rum without paying taxes or "anything."

In our view, a rational jury easily could have concluded that Pena knew someone was being bribed. He often answered the phone when Cianci called to set up the meetings at which he would be bribed. He was present when money changed hands and conceded that he believed the envelopes contained cash. Rather than being suspicious when Cianci fretted about getting into trouble at the office, Pena seemed to understand.

The jury could then have inferred that Pena knew exactly who was being bribed. Pena attended two sessions at which Cianci stamped official documents. The stamp bore Customs insignia and Cianci's badge number. A photo showed him gazing over Cianci's shoulder as the agent stamped documents. Cianci was clad in a uniform whose insignia was visible on at least some occasions. And both Soto and Cespedes, undisputedly aware

of Cianci's identity, trusted Pena enough to include him in every stage of the scheme and to delegate Soto's tasks to him. We have no difficulty concluding that a rational jury could have found that Pena knew Cianci was a public official.

### B. The Restitution Order

Pena claims that the restitution order was defective in several respects. We concern ourselves with two aspects of his argument: that the district judge should have made it clear on the record that he had considered Pena's ability to pay the restitution he ordered, and the contention, in which the government concurs, that the order should have imposed joint and several liability on Pena.

■ Pena did not object to the restitution order at trial. Because "[i]mproperly ordered restitution constitutes an illegal sentence and amounts to plain error," this failure is not a bar to our review. *United States v. Coleman*, 9 F.3d 1480, 1486 n. 4 (10th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1234, 127 L.Ed.2d 578 (1994); *cf. United States v. Spambanato*, 876 F.2d 5, 7 (2d Cir.1989) (illegal sentence is abuse of discretion).

■ We review for abuse of discretion a district court's order of restitution. *United States v. Lavin*, 27 F.3d 40, 42 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994) (citation omitted). A court may impose restitution only if it considers "the amount of loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a). Although we do not require district courts to set forth detailed findings, *see United States v. Atkinson*, 788 F.2d 900, 902 (2d Cir.1986), "the record must demonstrate that the court has considered these factors in ordering restitution." *United States v. Tortora*, 994 F.2d 79, 81 (2d Cir.1993); *see also Lavin*, 27 F.3d at 42.

At sentencing the district court made no mention of the statutory factors. Although counsel referred to Pena's straitened financial situation at the sentencing proceeding, he did so only to point out that his client had not profited from the illegal activity. The court gave no indication that it had considered this argument in deciding to impose restitution. *Cf. Lavin,* 27 F.3d at 42. Nor did the court direct that the restitution be made contingent on Pena's ability to pay, *see United States v. Broyde,* 22 F.3d 441, 442 (2d Cir.1994), which would have confirmed its consideration of the issue.

The government maintains that it is enough that the district court had before it a presentence report ("PSR") which reviewed Pena's financial circumstances. Adoption by a district court of a PSR that adequately sets forth the statutory factors tends to support a finding that the court in fact considered the mandatory factors. *See, e.g., Lavin,* 27 F.3d at 42 (together with PSR, court's comments indicated that it had exercised its discretion); *Coleman,* 9 F.3d at 1486; *United States v. Blanchard,* 9 F.3d 22, 24–5 (6th Cir.1993); *United States v. Smith,* 944 F.2d 618, 623 (9th Cir.1991), *cert. denied,* 503 U.S. 951, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992). *Cf. United States v. Molen,* 9 F.3d 1084, 1086 (4th Cir.1993) (in circuit that requires explicit findings, adoption of adequate PSR is sufficient), *cert. denied,* — U.S. —, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994); *but cf. Kok v. United States,* 17 F.3d 247, 251 (8th Cir.1994) (not enough that court had PSR before it where circuit requires explicit findings).

We need not decide whether adoption of a PSR alone would meet our requirement that the record as a whole reflect a district court's consideration of the factors because, in this case, the PSR was not adopted. We hold, however, that it is not enough for a district court to have before it a PSR which includes information that would be relevant to the consideration mandated by § 3664(a). *See United States v. Murphy,* 28 F.3d 38, 41 (7th Cir.1994) (even though PSR set forth financial information, still unclear whether district court "disregarded" financial status in ordering full restitution). We require an affirmative act or statement allowing an inference that the district court in fact considered the defendant's ability to pay. *See United States*

*v. Gelb,* 944 F.2d 52, 56 (2d Cir.1991) (statement that court has considered factors suffices) (citing *Atkinson,* 788 F.2d at 902–03).

We decline the government's invitation to infer, from the fact that the district court did not impose a fine, that the court had considered Pena's ability to pay. *Accord Murphy,* 28 F.3d at 42. The court made no statement that it declined to fine Pena because he would be unable to pay both amounts. Absent an affirmative indication that it had considered Pena's ability to pay the full restitution ordered, we must conclude that the district court abused its discretion.

Finally, the parties agree that the restitution order ought to have imposed liability on Pena jointly and severally with co-conspirator Soto. We leave determination of that issue to the district court's sound discretion upon remand.

### CONCLUSION

We have considered the rest of Pena's arguments and found them to be without merit. For the foregoing reasons, the conviction is affirmed. The sentence is vacated and remanded to allow the district court to consider Pena's ability to pay full restitution, and to determine whether liability ought to be imposed jointly and severally.