UNITED STATES of America, Appellee,

v.

Hector B. GERMOSEN, Defendant–Appellant.

Nos. 96–1524, 96–1666.

United States Court of Appeals,
Second Circuit.

Argued July 14, 1997.

Decided March 6, 1998.

Marjorie M. Smith, Tappan, NY, for Defendant–Appellant.

Ronald G. White, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, Of Counsel), for Appellee.

Before: WINTER, Chief Judge, JACOBS, and LEVAL, Circuit Judges.

WINTER, Chief Judge:

Hector B. Germosen appeals from his conviction and sentence following a jury trial in the United States District Court for the Eastern District of New York before Judge Seybert. He was convicted of a single count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and was sentenced to 60 months in prison and three years of supervised release. He was also ordered to pay restitution in the amount of approximately $1.6 million. Germosen argues that he was deprived of a fair trial by the admission of certain evidence and by improper statements by the government during summation. Germosen also challenges his sentence on a variety of grounds, taking issue with: (i) the "amount of loss" found to be attributable to his conduct; (ii) his criminal history category; (iii) the fact that the restitution order was based in part on conduct for which he

was not convicted; and (iv) a special condition of supervised release subjecting him to searches of his person and property. The government concedes that the district court's restitution order was erroneous insofar as it included amounts attributable to conduct for which Germosen was not convicted. We therefore remand for an appropriate recalculation. Otherwise, we affirm.

## BACKGROUND

Germosen operated a travel agency, Camino Travel and Tours ("Camino Tours"), in Queens, New York. It was accredited by the Airlines Reporting Corporation ("ARC"), a not-for-profit organization created and owned by major U.S. airlines. ARC acts as an intermediary between the airlines and travel agents and furnishes accredited travel agencies with blank ticket stock, which agents issue to their customers as airline tickets. Every week accredited agencies report ticket sales to ARC, which then withdraws the sales proceeds for that week from each agency's bank account (minus the agents' commissions) and forwards the proceeds to the appropriate air carriers. If a travel agency does not have sufficient funds in its bank account to make the required payment to ARC, ARC resorts to a variety of means to collect the money, the ultimate sanction being suspension of the agency's accreditation and confiscation of its ticket stock.

A "bust-out" is a fraudulent scheme in which a travel agency sells airline tickets to customers but then fails to remit the proceeds to ARC. Lizanne Siccardi, an auditor and investigator for ARC, testified that there is generally a lag of at least a month between the beginning of a bust-out and ARC's discovery of it. To reap substantial profits, the "busting-out" agency must order a large quantity of ticket stock and sell as many tickets as possible—usually at a cut-rate price—in a very short period of time. To increase the volume of quick sales, a busting-out agency will typically employ other travel agencies to assist in selling tickets. In exchange for their assistance, the cooperating agencies will usually receive a 50 percent commission on their sales, far exceeding the 10 percent received for sales of legitimate tickets, while the busting-out agency takes the other 50 percent. During a bust-out, the agency typically reports the sales of its tickets to ARC so that, upon discovering that the agency's bank account is empty, ARC will assume that the agency is experiencing financial difficulty rather than engaging in fraud.

Germosen was charged with participation in a conspiracy to defraud ARC by participating in bust-outs of several ARC-accredited travel agencies between 1992 and 1994. The government's case relied primarily on the testimony of five co-conspirators: Alexander Feliz, Pedro Gonzalez, Ernesto Gonzalez, Maria Ofelia Fonts, and Miosotis Acre. Their testimony revealed the following. Germosen became involved in the conspiracy through Alexander Feliz, an owner of two travel agencies, Trebol Travel in the Bronx and Kiwi Travel in Yonkers. Feliz, who admitted participating in at least ten other bust-outs, first met Germosen in October 1991 on a promotional trip to Guatemala for travel agents. After meeting socially several times in New York, Feliz and Germosen travelled to Cancun, Mexico, in January 1992. They were accompanied by Rosa Batista (now Feliz's wife) and Fatima Santana, an employee at Camino Tours. Feliz testified that, while in Cancun, he told Germosen that he "sold tickets from agencies that were going bankrupt," and that Germosen asked to be included. Feliz also testified in response to questions by the government and over defense objection that Germosen confided that he had told his wife he was at a conference in Washington, D.C., rather than in Cancun, and that he was therefore trying to avoid getting a suntan.

After their return to New York, Feliz and Germosen had more conversations about bust-outs. Feliz testified that he gave Germosen details about "an agency that was going bankrupt and that was selling tickets" and that Germosen asked Feliz "to connect him and to put him to work selling those tickets." In May 1992, Feliz, Germosen, and Batista travelled to the Dominican Republic, where they discussed the bust-out scheme further. They also discussed "the agencies that were going to be busted out." Germosen responded that he understood the work-

ings of the scheme and asked to be included in the next planned bust-out because he needed the money. Feliz agreed to "introduce him in the next one." Feliz testified that later, when he and Germosen were checking out of their hotel, he noticed that Germosen paid for his room with an American Express card in the name of "Hector G. Bonifacio." Feliz asked Germosen about the strange name, to which Germosen responded that Bonifacio "is my other name." Over objection, the government was allowed to introduce records showing that the Social Security number Germosen used to acquire that American Express card belonged to Germosen's father, Bienvenido Germosen.

In late May or early June 1992, Feliz received a call from a Jose Valdez, a travel agent, who informed Feliz that Pedro Tours would be the next agency to bust out. Feliz then attended a meeting at Valdez's office with Pedro Gonzalez, the owner of Pedro Tours, and others regarding the planned bust-out. Feliz said that he wanted to participate but could not because he had already planned a vacation in Europe. Feliz instead proposed that "someone else" distribute Feliz's tickets to his usual network of travel agents. Feliz then met with Germosen to tell him "that he [Germosen] was going to be in charge" of distributing the tickets to Feliz's network of travel agents, which included Miosotis Acre of Blue Moon Travel and Ofelia Fonts of Copacabana Travel. Germosen was to receive a commission on all tickets sold by Feliz's network and pay Feliz five percent of the proceeds. Feliz then informed Gonzalez that Germosen would perform Feliz's role during the bust-out, and Gonzalez accordingly met with Germosen to go over the details of the bust-out. Gonzalez told Germosen he would first receive a 35 percent commission, later to be "upgraded to 40 percent." Ernesto Gonzalez, Pedro's brother, would serve as a "bookkeeper" during this bust-out, keeping records of the distribution of, and payment for, the airline tickets. Ernesto Gonzalez testified that he provided Germosen with tickets and estimated that he received payments from Germosen in the amount of approximately $116,000 to $125,000 for the bust-out. Because Germosen retained a 40 percent commission, these figures

were approximately 60 percent of Germosen's ticket sales.

The cooperating witnesses gave testimony regarding Germosen's participation in the bust-outs of six other travel agencies—APA Travel, Adventure Travel, I & D Travel, Sammy's Travel, Maruja Plus Travel, and Kiwi Travel. Germosen's involvement again consisted primarily of selling those agencies' tickets and splitting the proceeds with his co-conspirators. Ernesto Gonzalez, who kept records of the APA Travel and Adventure Travel bust-outs, testified that he received payments from Germosen of approximately $100,000 and approximately $48,000 to $50,000 for the APA and Adventure tickets, respectively, with Germosen retaining his 40 percent commission. Feliz, who participated in the other bust-outs, estimated that Germosen earned commissions of between $100,000 and $125,000 for the Maruja Plus bust-out, approximately $200,000 for the I & D bust-out, and between $5,000 and $7,000 for the Sammy's bust-out. According to Feliz, these commissions represented approximately 50 percent of Germosen's overall sales.

Germosen's involvement in the November 1993 bust-out of Kiwi Travel, Feliz's agency, was more extensive. According to Feliz, Germosen suggested the bust-out and proposed that, in order to delay ARC's discovery of the scheme, they not report the sales to ARC. Germosen also posed as the owner of Kiwi Travel in conversations with an ARC auditor. Feliz estimated that Germosen sold about $300,000 worth of tickets during the Kiwi bust-out, of which Germosen, deducting his commission, paid Feliz $150,000.

Germosen was also charged with causing the default of his own travel agency, Camino Tours, as part of the conspiracy or a bust-out orchestrated by Germosen alone. However, the government decided that it was unclear whether the Camino Tours default, which took place after Germosen's arrest, was in fact part of the conspiracy. Accordingly, the government notified Germosen before trial that, if it could not show that the Camino Tours default was part of the conspiracy charged in the indictment, it would seek to admit the evidence under Rule 404(b), Fed.

R.Evid., as "a subsequent crime that goes directly to his intent or his knowledge." In a pretrial hearing on the issue, Germosen argued that the evidence regarding the Camino Tours default did not show fraud; rather, he argued, the agency "was put out of business because of his arrest." The government responded that the Camino Tours default followed "basically the same" pattern as the other defaults. Although Judge Seybert was initially inclined to exclude the evidence, she concluded that there was "sufficient evidence that the government claims it will offer that would make the acts of the defendant with respect to the Camino Travel Agency part of the conspiracy." She added, however, that if Germosen renewed his objection at trial, she would "entertain" the question of the evidence's admissibility under Rule 404(b).

After the close of evidence, the government conceded that it had not shown that the Camino default, although a bust-out, was part of the conspiracy. Instead, it stated that the evidence "was accepted basically as 404(b)" evidence. Accordingly, the government suggested, and Judge Seybert agreed, that the reference in the indictment to the Camino default should be deleted from the jury charge. Also, by agreement of the parties and the court, Judge Seybert instructed the jury that:

[T]he conspiracy charged in the indictment [in] the present case does not charge the defendant, Hector Germosen, with intentionally causing the default of Camino Tour Services Inc. If you find that the defendant did in fact intentionally default or defraud the [ARC] with regard to Camino Travel and Tour Services Inc. then you may consider these actions of the defendant with regard only to his intent to participate in the conspiracy charged in the indictment. However, proof that the defendant did in fact intentionally cause the default of Camino Travel and Tour Services, Inc. is not proof of his participation in the conspiracy charged in the indictment.

Germosen's principal defense at trial was lack of intent—that he "was as much a dupe of those who chose to defraud the airlines as were the airlines." With the exception of some documents regarding the default of Camino Tours, Germosen did not offer any evidence, relying instead on his opening statement and closing argument to attempt to undermine the credibility of his co-conspirators' testimony. For example, his counsel asserted in opening argument that:

[The trial] is about people selling their souls and purchasing their freedom with testimony. Because each and every one of these cooperators you will hear, has been told, if you cooperate you get a deal. If you—if your cooperation extends to testifying you get a better deal. The longer you testify, the more you say, the better the deal gets.

\* \* \*

You will find out that some of these cooperators never mentioned Mr. Germosen in their initial interviews. It is not until the government says to them, tell us about this guy, that the lightbulb goes off and they say aha, if we give them this guy we get a better deal. So we will give them this guy.

Germosen's counsel stated further that the co-conspirators were testifying against Germosen not because they "want to tell the truth," but because "it has been suggested to them if they include other innocent travel agents in this, they will do better when it comes to whether or not they walk out of this courtroom in handcuffs or walk out to their cars."

In response, the government stated in summation that each co-conspirator had taken an oath to tell the truth and that, if anyone were to lie, he or she could be prosecuted for perjury. The government also responded to the assertion in Germosen's opening argument that the witnesses will "do better at sentencing" if they "include other innocent travel agents in this scheme":

Now, ladies and gentlemen, is that really the way you think it works? Do you really think that there [is] some big shortage of crime in New York? Do you think there are not enough guilty people to keep the government busy that we have to spend our time prosecuting and framing innocent people?

The parties' respective summations continued in like manner, with Germosen accusing the government of having "bought" witnesses and the government responding that the co-conspirators had more incentive to name someone "who really is guilty" than to name "some innocent guy that has nothing to do with this." Neither side objected to any of these exchanges.

The jury found Germosen guilty of the conspiracy charged. On October 4, 1996, Judge Seybert held a sentencing hearing primarily to determine the amount of loss caused by Germosen for purposes of calculating his offense level under the Sentencing Guidelines. The district court found the amount of loss to be approximately $1.6 million.

The district court's calculation diverged from Germosen's primarily in two places. First, Germosen argued that he should be responsible for no more than $106,000 resulting from the bust-out of Pedro Tours. The court heard testimony from Ernesto Gonzalez that he had received $125,000 from Germosen for that bust-out. Based on that figure, plus the 40 percent commission Germosen was to receive from that bust-out, the court held Germosen responsible for $208,333. Germosen does not challenge this holding on appeal. Second, the district court found that, because of Germosen's heightened involvement in the Kiwi bust-out, he should be held responsible for the entire loss, which it calculated to be $502,000. Germosen argued that he should be held responsible only for tickets he personally distributed, a loss of $150,000. The district court's calculation of loss also included amounts derived from two bust-outs for which Germosen was not convicted. First, it included $23,524 from the default of Camino Tours. Second, based on Feliz's testimony at the sentencing hearing, the court included $150,000 from the bust-out of Paraiso Travel

in June or July 1993.[1] These amounts were included as relevant conduct under U.S.S.G. § 1B1.3.

Having found the amount of loss to be approximately $1.6 million, the district court calculated Germosen's base offense level to be six, pursuant to U.S.S.G. § 2F1.1(a), with a 12-level increase for a loss of "More than $1,500,000," pursuant to U.S.S.G. § 2F1.1(b)(1)(M). The court further raised Germosen's offense level by two levels for "more than minimal planning," U.S.S.G. § 2F1.1(b)(2), by two levels for using a "special skill" as an accredited travel agent in the commission of the offense, U.S.S.G. § 3B1.3, and by two levels for obstruction of justice, U.S.S.G. § 3C1.1, for an overall offense level of 24. The court found that Germosen fell into Criminal History Category II based on a prior conviction in February 1982, a finding to which Germosen did not object. These calculations resulted in a guideline range of 57 to 71 months' imprisonment. See U.S.S.G. Ch.5, Pt. A (Sentencing Table). The maximum sentence allowed by 18 U.S.C. § 371, however, is five years. Noting that this case "is the only occasion in my entire legal career that I felt that the . . . maximum is inadequate," the court sentenced Germosen to five years imprisonment.

The district court also ordered restitution in the amount of approximately $1.6 million, essentially the same as the amount of loss calculated for purposes of Germosen's offense level.[2] It also imposed several conditions of supervised release, including requirements that Germosen "cooperate with probation dep[artment] in payment of restitution, including full financial disclosure of personal and business records," and that Germosen "is subject to search of his person and property by probation." Germosen appeals from both his conviction and his sentence.

---

1. The district court's other calculations of loss attributable to Germosen's conduct included $100,000 from APA Travel; $50,000 from Adventure Travel; $160,000 from Maruja Plus (based on Feliz's testimony during the sentencing hearing); $400,000 from I & D; and $10,000 from Sammy's. Germosen does not dispute these findings on appeal.

2. The restitution figure was actually a few thousand dollars higher than the "amount of loss" figure, but the slight difference is not relevant to this appeal.

## DISCUSSION

### A. *Challenges to the Conviction*

Germosen argues that he was deprived of a fair trial in that: (i) the district court incorrectly applied Rule 404(b) of the Federal Rules of Evidence in admitting the Social Security records showing that he used his father's social security number to obtain an American Express card, Feliz's testimony that Germosen lied to his wife about going to Washington, D.C., and evidence of the default of his travel agency, Camino Travel; and (ii) the government made improper statements in its summation.

### 1. *Evidence admitted pursuant to Fed. R.Evid. 404(b)*

■ Rule 404(b) provides that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Such evidence is admissible, however, "for other purposes," such as proof of knowledge or intent. *Id.* We take an "inclusive approach" to "other acts" evidence: it can be admitted "for any purpose except to show criminal propensity," *United States v. Stevens,* 83 F.3d 60, 68 (2d Cir.1996), unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice. Fed.R.Evid. 403; *United States v. Larson,* 112 F.3d 600, 604 (2d Cir.1997). We review the admission of such evidence for abuse of discretion. "To find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States v. Pipola,* 83 F.3d 556, 566 (2d Cir. 1996) (citing *United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir.1992)). Moreover, even if there was an abuse of discretion, we will not order a new trial if the error was harmless— i.e., the evidence was "unimportant in relation to everything else the jury considered on the issue in question." *United States v. Rea,* 958 F.2d 1206, 1220 (2d Cir.1992) (quoting *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 1887, 114 L.Ed.2d 432 (1991)). *Accord,*

*e.g., Hynes v. Coughlin,* 79 F.3d 285, 291 (2d Cir.1996) (factors indicating evidence's degree of importance include whether it bears on an issue "plainly critical" to jury's decision and whether it was "emphasized in arguments to the jury").

Germosen challenges first the admission of the Social Security records. Germosen did not object to, and does not appeal from, the admission of American Express records showing that he procured an American Express card by using a Social Security number that was not his own. The Social Security records, which revealed that the Social Security number used belonged to Germosen's father, were admitted to show that the use of the wrong Social Security number was no mistake. We find no error.[3]

■ With regard to evidence of Germosen's statement to Feliz that he had told his wife he was at a conference in Washington, D.C., rather than in Cancun, Germosen asserts that it showed he had deceived his wife and was an adulterer, thereby creating a risk that the jury would penalize him for his bad character. The government argues that the evidence was relevant to show the level of trust between Germosen and Feliz that led to Feliz's disclosing to Germosen the bust-out scheme. *See Pipola,* 83 F.3d at 566 (one legitimate purpose for presenting evidence of extrinsic acts is "to help the jury understand the basis for the co-conspirators' relationship of mutual trust"). We need not reach the government's argument, however. This brief incident was, we believe, of no importance. Any error in admitting the evidence was harmless.

■ Finally, Germosen challenges the admission of evidence relating to the default of his travel agency, Camino Tours, on the grounds that: (i) the default occurred after the conspiracy had ended; (ii) because the cause of the default was contested, the evidence diverted the jury's attention from the charged offense; and (iii) the court's limiting instruction was confusing. We disagree.

---

**3.** Because of our disposition of this issue, we need not address the district court's alternative ground for admitting the Social Security records—that it corroborated a witness's testimony

that Germosen stated that he planned to avoid paying taxes from the proceeds of the conspiracy by putting the "money under somebody else's Social Security number."

■ The fact that the evidence involved a subsequent rather than prior act is of no moment. "Subsequent act" evidence may be admitted under Rule 404(b). *See United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir.1990). Germosen's reliance on *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir. 1979) is misplaced. *Manafzadeh* held that evidence of other crimes was inadmissible, not because those other crimes were "subsequent acts," but because they were "not relevant to the charge against [the defendant]." *Id.* at 88. Here, by contrast, the evidence of the Camino default was directly relevant to Germosen's claimed lack of intent in conspiring in prior bust-outs. The fact that the cause of the default was disputed did not render the evidence inadmissible. Germosen was entitled to present his interpretation of the evidence—that the default resulted from his arrest and not from any intentional wrongdoing—to the jury. The trial judge determined that issues concerning the Camino default would not improperly distract the jury, a decision well within her discretion.

■ Also, by agreement of the parties and the court, Judge Seybert instructed the jury that the indictment did not charge Germosen with intentionally causing the default of Camino Tours, that evidence on that issue might be considered "with regard only to his intent to participate in the conspiracy charged in the indictment," and that proof that Germosen intentionally caused the default of Camino Tours "is not proof of his participation in the conspiracy charged in the indictment." Although Germosen now argues that these instructions were confusing, we again disagree. Not only were they sufficiently clear, but they were also identical to those proposed by Germosen himself.

### 2. Comments in the Government's Summation

■ Germosen next objects to comments made during the government's summation suggesting that it would not have prosecuted Germosen if he were innocent and that the co-conspirators had an interest in testifying truthfully because of their cooperation agreements with the government. Our review of this issue is limited. Rarely are comments in a prosecutor's summation "so prejudicial that a new trial is required." *United States v. Forlorma*, 94 F.3d 91, 93 (2d Cir.1996) (quoting *United States v. Rodriguez*, 968 F.2d 130, 142 (2d. Cir.1992)). "Reversal is warranted only where 'the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" *Id.* at 94 (quoting *United States v. Pena*, 793 F.2d 486, 490 (2d Cir.1986)). In making this determination, we consider: (i) the severity of the misconduct, (ii) the measures taken to cure the misstatements, and (iii) their likely effect on the outcome. *Id.* at 95; *accord United States v. Miller*, 116 F.3d 641, 683 (2d Cir.1997). Moreover, where, as here, the defendant did not object to the remarks at trial, reversal is warranted only where the remarks amounted to a "flagrant abuse." *United States v. Araujo*, 79 F.3d 7, 9 (2d Cir.1996). No such flagrant abuse occurred here.

The government's comments, and, in particular, its suggestion that it is too busy "to spend [its] time prosecuting and framing innocent people," were arguably improper. *See United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir.1991) (holding improper prosecutor's comment that "[y]ou don't think the government is busy enough prosecuting crimes that it has the time to be prosecuting innocent people, going after people arbitrarily?"). As in *LaMorte*, however, reversal is not warranted. There, we held that the prosecutor's comment did not deprive the defendant of a fair trial because, when viewed in context, it was best read not as implying that the prosecutor had access to extra-judicial evidence, but as "ridiculing the notion that the government had arbitrarily constructed a massive case against [the defendant] out of thin air." 950 F.2d at 83–84. We arrived at this conclusion although acknowledging that the comment was improper. The danger in a statement such as that made by the prosecutor here is the implication that the prosecution believed in his witnesses' credibility and perhaps the suggestion that the government has evidence of guilt not presented to the jury. Where such a statement is made in response to an attack on the credibility of the government's witnesses based on their cooperation with the

government to obtain leniency, there is danger of prejudice. However, the prosecutor's comment here was in the context of defense counsel's assertion that the government had suggested to the co-conspirators that if they "include[d] other innocent travel agents in this," they would receive a lighter sentence. Given the defense's charge of wholesale subornation of perjury to convict innocent persons, we cannot say that the prosecutor's response was improper. Unlike *LaMorte*, moreover, the evidence here was overwhelming.

■ The government's suggestion that the co-conspirators had an interest in telling the truth was, likewise, directed at Germosen's assertion that the co-conspirators' true interest was not in telling the truth, but in implicating Germosen. Viewing the case as a whole, therefore, including Germosen's failure to object to the prosecutor's comments, we cannot say that the comments deprived Germosen of a fair trial.

### B. *Challenges to the Sentence*

Germosen claims his sentence was erroneous because: (i) the district court erred in calculating Germosen's offense level based on a finding of responsibility for losses in the amount of $1.6 million; (ii) the district court erroneously determined Germosen's criminal history category; (iii) the restitution order ignored Germosen's inability to pay and was based in part on conduct that was not part of the offense of conviction; and (iv) the district court abused its discretion by imposing a special condition of supervised release that Germosen be subject to searches of his person and property. The government concedes part of Germosen's third argument.

#### 1. *Calculation of Germosen's Offense Level*

■ Germosen claims that he should have been sentenced at offense level 23 rather than 24 because the evidence did not support a finding that he was responsible for losses to ARC of "[m]ore than $1,500,000" under U.S.S.G. § 2F1.1(b)(1). He argues, first, that the evidence upon which the court based its finding consisted of vague "ballpark figures" provided by co-conspirators.

He argues, second, that the district court erroneously held him responsible for the entire $502,000 loss caused by the bust-out of the Kiwi Travel Agency rather than, as it had with other bust-outs, holding him responsible merely for the amount of his own sales. We again disagree.

■ We review a district court's calculation of loss for clear error. *United States v. Reese*, 33 F.3d 166, 174 (2d Cir.1994). Application Note 8 to U.S.S.G. § 2F1.1 states that "the loss need not be determined with precision" and that the court "need only make a reasonable estimate of the loss, given the available information." The district court's loss calculation was based entirely on the testimony of Alexander Feliz and Ernesto Gonzalez, who were intimately involved in the financial details of the conspiracy. Those witnesses admitted that their dollar figures were estimates, but that fact does not, given the plain language of Application Note 8, render them an unsound basis for determining the amount of loss. Moreover, Germosen did not produce any evidence contradicting the co-conspirators' estimates. *See Reese*, 33 F.3d at 174 (district court entitled to rely on dollar amounts summarized by prosecution absent indication that amounts are incorrect). The district court's finding, based on the co-conspirators' testimony, was not, therefore, clearly erroneous.

■ As to the bust-out of the Kiwi agency, the district court concluded that, for sentencing purposes, Germosen should be held responsible for the total amount of the agency's loss, estimated to be approximately $502,000, rather than for the amount of Germosen's own sales. Germosen does not challenge the accuracy of the $502,000 figure as the Kiwi loss. Rather, relying on *United States v. Studley*, 47 F.3d 569 (2d Cir.1995), he argues that he was acting as merely a "salesman" during the Kiwi bust-out and can be held responsible only to the extent of his own sales.

Germosen's reliance on *Studley* is misplaced. There, the defendant was hired as a salesperson in a telemarketing scheme, and his job was limited to inducing would-be customers to pay an "application fee" for a loan

that the company would then fail to provide. The evidence was clear that, although Studley was a successful salesperson, he was a pawn. He followed instructions on how to defraud potential customers but did not design or develop the scam. He did not work in any way to further the scheme outside of his sales efforts and was paid on commission. 47 F.3d at 576. In sum, Studley "had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales." *Id.*

The district court found that Germosen's role in the Kiwi bust-out was much more than that of a salesman. Germosen suggested the bust-out, and, posing as Kiwi's owner in conversations with an ARC auditor, stalled ARC's discovery of the bust-out. Given his expanded role, there was no error in the district court's decision to hold him responsible for the entire amount of the loss sustained in the Kiwi bust-out.

### 2. *Criminal History Category*

 The district court, without objection, found that Germosen fell within Criminal History Category II because of a felony conviction in February 1982. Germosen now argues that he did not enter the conspiracy until May 1992 and that his prior conviction occurred more than ten years before his involvement in that conspiracy. Accordingly, he argues, the prior conviction was erroneously included in determining his criminal history. *See* U.S.S.G. § 4A1.2(e)(2). The government responds that Germosen entered the conspiracy in January 1992, during the trip to Cancun, and that the prior conviction was properly considered.

We agree with the government. Feliz testified at trial that Germosen asked to participate in the bust-outs during the Cancun trip. Germosen made no attempt to add to the trial record on this point—or even object to reliance on the 1982 conviction—and the district court's ruling, which amounts to a finding of adjudicative fact, is not clearly erroneous.

### 3. *Restitution Order*

 Germosen challenges, on three grounds, the order that Germosen pay over $1.6 million in restitution. First, he argues that because the evidence was too vague to support the "amount of loss" calculation for purposes of his offense level, it was also too vague to support a restitution award. As we stated above, the district court's loss calculation for purposes of determining Germosen's offense level was based on the evidence and was not clearly erroneous. Of course, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution. For example, Application Note 7 to § 2F1.1 of the Sentencing Guidelines allows for a loss calculation based on "intended loss," whereas 18 U.S.C. § 3663(a)(1)(A) requires a showing of actual loss for purposes of restitution. *See United States v. Cheng*, 96 F.3d 654, 657–58 (2d Cir.1996); *see generally United States v. Catherine*, 55 F.3d 1462, 1464–65 (9th Cir. 1995) (discussing other differences in methodology). However, the quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same in both contexts. *See United States v. Copus*, 110 F.3d 1529, 1537 (10th Cir.1997) (stating that the two calculations are "closely related"); *United States v. Henoud*, 81 F.3d 484, 490 (4th Cir.1996) (citing U.S.S.G. § 2F1.1 and Application Note 8 in discussing calculation of loss for restitution purposes). Accordingly, because Judge Seybert's amount-of-loss calculation for Germosen's offense level was supported by the evidence and was based on actual losses to the victims, Germosen's challenge to the loss calculation for the restitution award must fail.

 Second, Germosen argues that the district court abused its discretion by failing to consider Germosen's financial resources and his family circumstances and in ignoring the PSR's conclusion that he could pay only partial restitution. The district court is, of course, not bound by the recommendations in a PSR. *Miller*, 116 F.3d at 685. Indeed, in arriving at a restitution order, the court cannot rely solely on the PSR's findings but must make an affirmative statement "allowing an inference that the district court in fact considered the defendant's ability to pay." *United States v. Mortimer*, 52 F.3d 429, 436 (2d Cir.1995) (quoting *United*

*States v. Soto*, 47 F.3d 546, 551 (2d Cir. 1995)). We have been clear that, although the district court need not set forth its findings in detail, the "record must reflect that it has considered the statutorily mandated factors." *Id.* Those factors, set forth in 18 U.S.C. § 3663(a)(1)(B)(i), include the amount of loss, defendant's financial resources, defendant's and his or her dependents' financial needs and earning ability, and such other factors the court deems appropriate.

■ Here, the district court clearly considered Germosen's ability to pay. At the sentencing hearing, the court spent a considerable amount of time discussing Germosen's assets. The court concluded that, in light of the facts that his three children were in parochial school, he had owned several pieces of real estate, he owned at least one Jaguar, and properties held in Germosen's wife's name were "a charade," Germosen had available the assets to pay restitution in full. Germosen had the burden of proving his inability to pay. The district court considered and rejected Germosen's asserted inability to pay, and its decision was not clearly erroneous.

■ The government concedes, however, that the district court did err in including the amounts of loss from the bust-out of the Paraiso Travel Agency ($150,000) and from the default of the Camino Travel Agency ($23,524.02). Those defaults, although properly part of the district court's loss calculation as relevant conduct, *see* U.S.S.G. § 1B1.3, were not part of the offense of conviction. Absent a stipulation in a plea agreement, a sentencing court may award restitution only for losses directly resulting from the "conduct forming the basis for the offense of conviction." *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir.1994). Therefore, the district court's restitution order must be remanded for recalculation.

### 4. *Special Condition of Supervised Release*

■ Finally, Germosen contends that the district court abused its discretion in ordering, as a condition of supervised release, that he "be subject to search of his person and property by probation." A district court may impose special conditions of supervised release to the extent that they are "reasonably related" to (i) the nature and circumstances of the offense and the history and characteristics of the defendant, and (ii) the purposes of sentencing, including the need to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed training or treatment. U.S.S.G. § 5D1.3(b); *accord* 18 U.S.C. § 3553(a)(2); 18 U.S.C. § 3583(d). *See also United States v. Abrar*, 58 F.3d 43, 46 (2d Cir.1995) (condition of supervised release must be reasonably related to one or more factors listed in U.S.S.G. § 5D1.3(b) and 18 U.S.C. § 3553(a)(2)). The court must also be cautious that such a special condition "involves no greater deprivation of liberty than is reasonably necessary for the purposes" of sentencing. 18 U.S.C. § 3583(d)(2); *see also* 18 U.S.C. § 3553(a)(2); *cf. United States v. Tolla*, 781 F.2d 29, 34 (2d Cir.1986) ("conditions that restrict a probationer's freedom must be especially fine-tuned"). Although district courts have broad discretion in tailoring conditions of supervised release to meet the specific circumstances of a given case, they do not have "untrammelled" discretion. *United States v. Amer*, 110 F.3d 873, 883 (2d Cir.1997).

The Sentencing Commission recommends that where a court imposes an order of restitution, it should "impose a condition requiring the defendant to provide the probation officer access to any requested financial information." U.S.S.G. § 5B1.4(b)(18). The district court imposed essentially such a condition; the issue is whether the further order subjecting Germosen to searches of his person and property was an abuse of discretion.

At the sentencing hearing, Judge Seybert clarified that searches would be limited to those that the probation department finds "necessary to secure information ... regarding his finances." Her reasoning behind the condition, as with her reasoning behind other aspects of Germosen's sentence, was made clear during the sentencing hearing, where she stated that:

[t]his is a place where there should be some justice and as I said I've never seen a defendant obstruct justice more. I've never seen a defendant come in and consistently lie more than you have with respect to these records, with respect to other events, information that you've put in your affirmations that you swear to, it's just awful.

For example, Judge Seybert noted that Germosen concealed documents relating to Camino Tours by stating that they had been stolen, only to present the documents in court. He also posed as an attorney on multiple occasions and in several contexts including, apparently, a scheme to steal money from "clients" by falsely representing that he could obtain green cards. To frustrate the investigation into the bust-out scheme, he filed a false complaint against a postal inspector. And, as discussed above, Germosen procured an American Express card by using his father's Social Security number. Germosen does not dispute any of these findings.

These findings, plus, of course, Germosen's two-year involvement in a conspiracy to defraud ARC, caused Judge Seybert to be appropriately skeptical about Germosen's future willingness to satisfy the restitution order or to disclose accurate and complete financial information upon request. The additional requirement that he be subject to searches is "reasonably related" to the nature of Germosen's offense, to the history and characteristics of Germosen himself, and to the purposes of sentencing. Because Germosen's candor on financial matters is demonstrably untrustworthy, a condition requiring that he submit to searches of his property is entirely reasonable. In addition, searches of Germosen's person may disclose items relevant to his financial condition as well including, for example, credit cards in his own or any other name, checkbooks, receipts, car keys, or business cards (which Germosen had previously used to identify himself, falsely, as a licensed attorney).

We further believe that the deprivation of liberty accompanying the search requirement was no more than that "reasonably necessary" to ensure Germosen's compliance with the restitution order. *See United States v.*

*Chinske,* 978 F.2d .557, 560 (9th Cir.1992) (condition of release subjecting defendant to "a search of his person, vehicle and/or residence upon request" reasonable where defendant had been convicted of maintaining a residence for the cultivation of marijuana); *United States v. Sharp,* 931 F.2d 1310, 1311 (8th Cir.1991) (condition subjecting defendant to unrestricted warrantless searches for alcohol and drugs was within court's discretion in conviction for conspiracy to distribute cocaine). We therefore hold that the district court's condition of supervised release, subjecting Germosen to searches necessary to secure financial information, was not an abuse of discretion.

## CONCLUSION

For the reasons stated above, we affirm Germosen's conviction for conspiracy to commit wire fraud. We remand the district court's restitution order for recalculation consistent with this opinion. We affirm Germosen's sentence in all other respects.