**UNITED STATES of America,**
**Appellee,**

v.

**Brandon Michael LIFSHITZ,**
**Defendant–Appellant.**

**Docket No. 03–1221.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 22, 2004.

Decided: March 30, 2004.

Amended: May 10, 2004.

---

Jennifer G. Rodgers, Assistant United States Attorney (Celeste L. Koeleveld, Assistant United States Attorney on the brief) for James B. Comey, United States Attorney for the Southern District of New York, New York, NY, for Appellee United States of America.

Steven M. Statsinger, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Defendant–Appellant Brandon Michael Lifshitz.

Before: CALABRESI, KATZMANN, and B.D. PARKER, Circuit Judges.

KATZMANN, Circuit Judge:

This case considers whether a computer monitoring condition imposed upon a probationer infringes upon his Fourth Amendment right to be free of unreasonable searches. The defendant appeals from a sentence imposed by the United States District Court for the Southern District of New York (Robert P. Patterson, *District Judge*). We hold that the "special needs" of the probation system may render a computer monitoring condition reasonable, but determine that the condition as it stands may be overbroad, and, therefore, remand to the district court for the imposition of a condition consistent with this opinion.

## I. BACKGROUND

On February 8, 2001, agents from the Federal Bureau of Investigation ("FBI") paid a visit to the household of Brandon Michael Lifshitz, then thirty years old, and his mother, sister, and niece. They sought to investigate the source of certain transmissions of child pornography to and from accounts registered in the name of Jo–Ann Lifshitz, Brandon's mother. The Lifshitzes consented to a search of the computer in their home, and also submitted voluntarily to interviews by the FBI agents. During the course of these discussions, Brandon admitted that he had been downloading child pornography since the year 2000 and had also disseminated such pornographic images by posting them on a web site. Brandon's mother corroborated this account, indicating that she had observed him examining these materials on the computer and repeatedly requested that he delete them. The FBI agents' search uncovered empirical confirmation in the form of pornographic pictures of children.

Brandon Lifshitz was, as a result, indicted upon two counts for violation of 18 U.S.C. § 2252A(a)(2)(A). The first count alleged that he had "unlawfully, willingly, and knowingly received [on his computer] child pornography ... which had traveled in interstate commerce," and the second stated that he had also "unlawfully, willingly, and knowingly distributed child pornography ... in interstate commerce."

Subsequent investigation indicated that Lifshitz was gainfully self-employed in a car repossession business that he and a

partner had started eight years before and had also worked successfully as a security guard. The history of his past relationships was not, however, reassuring. As a teenager, he had initiated an incestuous liaison with his sister, and he had, more recently, pursued a correspondence over the Internet with an 18–year–old woman in Michigan to whom he ultimately paid a visit.

On December 11, 2001, Lifshitz pled guilty to count one of the charges, that of receiving child pornography, in exchange for the government's agreement, pursuant to a plea bargain, to drop the remaining count. The calculations set forth in the plea agreement resulted in a stipulated Sentencing Guidelines range of between 27 and 33 months, as well as a potential fine of between $6,000 and $60,000. The defendant did, however, reserve the right to move for a downward departure because of diminished capacity under United States Sentencing Guideline § 5K2.13, which provides that "[a] sentence below the applicable guideline range may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity . . . ."

Exercising this right, defense counsel submitted a letter on September 24, 2002, requesting that the court depart downward to a noncustodial sentence on the ground that Lifshitz's capacity was diminished at the time of the offense because he lacked the ability to control behavior that he knew was wrong. This communication relied principally upon reports generated by three different psychiatrists who evalu-

ated Lifshitz's condition. One, prepared by Dr. Robert Berger in November of 2001 at the request of defense counsel, diagnosed Lifshitz as suffering from Schizoid Personality Disorder, which the doctor characterized as "a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings." Another, dated February of 2002, and composed by Dr. Lawrence Siegel at the instruction of the government, concluded that Lifshitz had a personality disorder, and, disagreeing with Dr. Berger's conclusion that "[t]here is no evidence from psychiatric examination that Mr. Lifshitz has a pedophilic disorder or that he is a sexual predator," provisionally diagnosed pedophilia, with a sexual attraction to females, and sexual sadism. Finally, Dr. Thomas Hopkins, who treated Lifshitz for approximately 18 months after his arrest, asserted that the defendant suffered from depression and obsessive-compulsive disorder at the time of his arrest, illnesses that had been induced partially by the 1997 death of his father, with whom Lifshitz was, by all accounts, extremely close.[1]

When sentencing the defendant on April 7, 2003, the court determined that a downward departure to a noncustodial sentence—permitting Lifshitz to continue living at the house of his grandmother, with whom he had been residing since his arrest—would indeed be appropriate under the circumstances. In addition to defense counsel's letter and the government's objections, the court took into consideration an additional psychological report, gener-

---

1. Letters that Lifshitz's family members wrote in support of his application for a downward departure emphasized the impact on the defendant of his father's death. *See* Letter of Lifshitz's Grandmother, Alberta Tassell ("Brandon and his father Neil had a special relationship. . . . Neil was not only a father to Brandon, but also his best friend sharing in most activities. When Neil died, Brandon lost everything. He tried to be the Man of the House but couldn't. His father's death was devastating."); Letter of Jo–Ann Lifshitz ("Brandon was severely hurt and angered by his father's death. He and my husband had a relationship that was one of love, trust and partnership.").

ated by a Dr. McCarthy, suggesting that Lifshitz could be treated on an outpatient basis and that imprisonment might exacerbate his preexisting psychological problems. As Judge Patterson stated,

> I think the most important thing for the defendant is continued treatment and I don't think that for the variety of psychological problems that he has, not the least of which is his problem with attraction to children under the age of 18, . . . sentencing to prison will accomplish that objective.

The court therefore sentenced Lifshitz to three years probation rather than a prison term. At the same time as it granted this ten-level downward departure, the court imposed certain probation conditions, one of which underlies Lifshitz's appeal.

In addition to the mandatory conditions of probation, the court enumerated several other requirements, including, *inter alia*,[2] that:

> [T]he defendant shall consent to the installation of systems that will enable the Probation office or its designee to monitor and filter computer use on a regular or random basis and any computer owned or controlled by the defendant. The defendant shall consent to unannounced examinations of any computer equipment owned or controlled by the defendant which may result in the retrieval and copying of all data from the computer and any internal or external peripherals and may involve removal of such equipment for the purpose of conducting a more thorough investigation.

Defense counsel vigorously objected to this condition, noting that he believed it violated *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), which he

read as establishing a threshold of reasonable suspicion for probationary searches. The government argued, in response, that "the reason that computer searches are considered acceptable without prior notification is based upon the nature of the offense [for which Lifshitz] is convicted." Elaborating upon this justification, and introducing the first of many analogies that have appeared in this litigation, the government maintained that:

> I don't think that the *Griffin* ruling applies because . . . . [t]his was a crime committed with the computer. We're not saying the defendant can't use computers. We're just saying that the Probation [O]ffice ought to be able to monitor his computer usage. It's not the same as his privacy interests in his home, for example.
>
> It's more akin to his interests in his bank accounts[,] and if he had committed a financial crime, I don't think there's any question that the Probation [O]ffice could monitor his bank account activity, for example, without having reasonable suspicion that he was committing additional financial crimes.
>
> So, it seems to me that the Probation [O]ffice should not need to have reasonable suspicion to monitor his computer usage given the nature of the crime he's committed.

The court disagreed, holding that the search "has to be based upon reasonable suspicion," and changing the condition by substituting the statement "upon reasonable suspicion, probation may make unannounced examinations of any computer equipment at home and controlled by the defendant" for the phrase "the defendant shall consent to and cooperate with."[3]

---

2. Two other conditions that Lifshitz also challenged in this appeal are disposed of in a

summary order issued in conjunction with this opinion.

3. The resulting language read, in its entirety:

After this reformulation, the Chief U.S. Probation Officer, Chris Stanton, wrote to the court, noting that the first sentence of the condition was, in his view, inconsistent with the second, and proposing an interpretation aimed at reconciling the two sentences. As Stanton stated in his letter of April 14, 2003, "I presume that it was the Court's intention to authorize the probation officer to monitor Lipfshitz' [sic] computer on a regular basis. If child pornography is then found the 'reasonable suspicion' standard would be satisfied and the probation office may conduct a search of his computer and residence." Defense counsel countered, on April 17, that such monitoring would violate *Griffin* because it was not based upon reasonable suspicion, and, therefore, requested that the court amend the condition to require the installation of filtering or blocking, rather than monitoring software. On April 21, the court confirmed Stanton's reading of the special condition. This appeal followed.

## II. ANALYSIS

■ When reviewing the conditions of probation imposed by a district court, we appraise issues of law *de novo*. *United States v. A–Abras Inc.*, 185 F.3d 26, 30 (2d Cir.1999). We thus consider anew the merits of Lifshitz's Fourth Amendment claim.

■ The Fourth Amendment restrains the government from performing "unreasonable searches and seizures." U.S. Const. amend. IV. The touchstone in evaluating the permissibility of any search is

"reasonableness." *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In most cases, reasonableness requires a warrant and probable cause. *Id.* The Supreme Court has, however, demarcated certain areas in which a lesser—or even nonexistent—level of individualized suspicion is sufficient to render a search constitutional. The two such intersecting spheres of principal relevance to this appeal are those of probationary and (other) "special needs" searches.

We first examine the standards that have been applied to probationary searches, then turn to several contexts in which "special needs" have legitimated searches in the absence of a warrant or probable cause. Consideration of these two sets of precedents suggests that a "special needs" approach is appropriate in this case. We then elaborate upon the application of the "special needs" logic to Lifshitz's computer monitoring probation condition.

■ In pursuing this analysis, we remain mindful of the overarching rehabilitative and supervisory goals of probation as well as the circumstances in which probation was granted in this particular case. As Justice Scalia noted in *Griffin*, probationary "restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164

The defendant shall consent to the installation of systems that enable the probation officer or designee to monitor and filter computer use, on a regular or random basis, on any computer owned or controlled by the defendant. Upon reasonable suspicion, the probation office may make unannounced examinations of any computer equipment owned or controlled by the defendant, which may result in retrieval and copying of all data from the computer(s) and any internal or external peripherals, and may involve removal of such equipment for the purpose of conducting a more thorough inspection.

(citation omitted). The details surrounding the district court's decision to grant Lifshitz probation rather than to impose a prison term of over two years suggest that balancing the rehabilitative and therapeutic goals of probation against the potential for public harm occasioned by permitting the defendant to forgo prison time was, in this case, of paramount importance. Indeed, the district court showed admirable sensitivity to the needs of the defendant while at the same time attempting to protect the public. Allowing the probation department to monitor Lifshitz's attempts at accessing child pornography could be crucial to achieving the desired balance and to preventing the defendant from continuing in his illegal behavior. While upholding Fourth Amendment protections against unreasonable searches, we must therefore also remember that the alternative facing Lifshitz in the absence of a computer monitoring probation condition might well be the more extreme deprivation of privacy wrought by imprisonment.

## A. Probationary Searches

On several occasions, the Supreme Court has indicated that searches of probationers may be pursued without a warrant and under a standard lower than that of probable cause. Each case that the Court has considered has, however, involved at least some quantum of individualized suspicion, whether phrased as "reasonable grounds" or "reasonable suspicion." Two important governmental interests in probation have been articulated in the relevant cases—one involves monitoring probationers' compliance with the requirements and conditions of probation and the other entails preventing probationers' future violations of the law. The former interest has been termed a "special need" of the probation system "beyond normal law enforcement," *Griffin*, 483 U.S. at 873–74, 107 S.Ct. 3164, where-

as the latter is continuous with other law enforcement interests.

In *Griffin*, the Court determined that "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds,' as defined by the Wisconsin Supreme Court." *Id.* at 876, 107 S.Ct. 3164. This "reasonable grounds" standard derived from the Wisconsin probation statute itself, which authorized a probation officer "to search a probationer's home without a warrant ... as long as there are 'reasonable grounds' to believe the presence of contraband—including any item that the probationer cannot possess under the probation conditions." *Id.* at 870–71, 107 S.Ct. 3164. According to the Court, the search in *Griffin* of the probationer's home "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880, 107 S.Ct. 3164. The majority thus refrained from determining whether "reasonable grounds" constitutes, in general, the minimum level of suspicion required to justify probationary searches, and instead simply upheld the standard articulated by Wisconsin law as in conformity with the Fourth Amendment.

■ In the probation context, "[s]upervision ... is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875, 107 S.Ct. 3164. Addressing why the obligations of procuring a warrant or demonstrating probable cause would interfere with this "special need" of the probation system, and why such requirements might not be suited to the probation context, the Court noted several considerations: the operations of the probation system would

be impeded by requiring a magistrate instead of a probation officer to decide how closely to supervise the probationer, *id.* at 876, 107 S.Ct. 3164; the "delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct," *id.;* predicating probationary searches upon a warrant or probable cause would reduce their deterrent effect, *id.* at 876–78, 107 S.Ct. 3164; the activities of the probation officer, unlike those of a police officer, are not directed exclusively at law enforcement, but instead are designed both to serve the needs of the state and further "the welfare of the probationer," *id.* at 876, 107 S.Ct. 3164; and it is reasonable, in deciding whether or not to conduct a probationary search, to take into account factors that would not normally be part of an inquiry into probable cause, like the probation officer's experience with the particular individual, *id.* at 878–79, 107 S.Ct. 3164.

While the Court in *Griffin* refrained from addressing the standard of individualized suspicion to which probationary searches must conform in the absence of a governing statute, it turned to this question in *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In *Knights,* the Court determined that a search of a probationer's apartment based upon reasonable suspicion and conducted pursuant to a probation order mandating that he "submit his … person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer," *id.* at 114, 122 S.Ct. 587 (brackets omitted), satisfied the Fourth Amendment. Dispensing with its previous distinction between searches undertaken for probationary and for investigative purposes, and, with that distinction, the "special needs" justification articulated in *Griffin* for reducing the level of suspi-

cion required for probationary searches, the Court in *Knights* held that "the search … was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." *Id.* at 118, 122 S.Ct. 587 (citation omitted).

Rather than relying on the fact that monitoring compliance with probation conditions constitutes a "special need," the Court applied a more general test of reasonableness. As Chief Justice Rehnquist stated, writing for the Court:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Id.* at 118–19, 122 S.Ct. 587 (citation and internal quotation marks omitted). In the case of a probationer, the imposition of a search condition as part of probation creates a diminished expectation of privacy. *Id.* at 119–20, 122 S.Ct. 587. Likewise, because "the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law," *id.* at 120, 122 S.Ct. 587 (internal quotation marks omitted), the state may have a greater interest with respect to probationers than with respect to ordinary citizens in anticipating and attempting to prevent potential violations of the law, *id.* at 120–21, 122 S.Ct. 587.

In *Knights,* however, the Court refrained from upholding generally the search condition that had been imposed—which, on its face, would have permitted suspicionless searches—and decided only that the particular search at issue met the requirements of the Fourth Amendment,

because it was based upon reasonable suspicion. *Id.* at 120 n. 6, 122 S.Ct. 587 ("We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.") (citation omitted). In doing so, the Court avoided considering whether the doctrine of unconstitutional conditions would limit the kinds of provisions to which a probationer could consent at sentencing. *Id.* at 118 n. 4, 122 S.Ct. 587.

 Two conclusions emerge from *Griffin* and *Knights*. Probationary searches—whether for law enforcement or probationary purposes—are acceptable under *Knights* if based upon reasonable suspicion (or potentially a lesser standard). Furthermore, under the "special needs" doctrine articulated in *Griffin*, searches for probationary purposes will be upheld if authorized by a law that is in itself reasonable. *Griffin* does not, however, itself elaborate criteria for determining the reasonableness of a regulation.

In several cases, this Circuit has been called upon to apply the Fourth Amendment principles derived from *Griffin* and *Knights*. *United States v. Grimes* involved a parolee who had failed to comply with court-imposed conditions of drug treatment and had lied to his parole officer about contact with the police. 225 F.3d

254, 256 (2d Cir.2000) (per curiam). Although the case involved a parolee rather than a probationer, we analyzed the permissibility of a search of Grimes's bedroom based upon the reports of his parole violations under *Griffin*.[4] In doing so, we first examined the standard for parole searches under applicable New York law—established, unlike in *Griffin*, by the judiciary rather than the legislature—then considered whether "the special needs attendant to the operation of New York's parole system justify ... departure from traditional Fourth Amendment principles." *Id.* at 258. We concluded that the New York rule that "whether [a parole search] was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty," *id.* at 258 (internal quotation marks omitted), conformed with the requirements of the Fourth Amendment because the reference to the performance of the parole officer's duty implicated the special needs of the parole system and justified only those searches commensurate with those special needs, *id.* at 259 n. 4. In *Grimes*, we thus supplemented the logic of *Griffin* by evaluating the reasonableness of New York law by reference to established Fourth Amendment principles.

Following *Knights* as well as *Griffin*, we considered in *United States v. Reyes* whether evidence that Reyes was growing marijuana plants in his garden—evidence gathered by a probation officer during a home visit arranged by the Drug Enforcement Agency—had been collected in violation of the Fourth Amendment. *United States v. Reyes*, 283 F.3d 446, 451–52 (2d

---

4. Supervised release, parole, and probation lie on a continuum. The most severe is "supervised release," which is "meted out in addition to, not in lieu of, incarceration,"

*United States v. Reyes*, 283 F.3d 446, 461 (2d Cir.2002) (internal quotation marks omitted); supervised release is followed, in descending order, by parole, then probation, *id.*

Cir.2002). Because he was on supervised release, and subject to a search condition like that in *Knights*, which permitted home visits "at any time," *id.* at 460, "Reyes's actual expectation of privacy in the environs of his home was necessarily and significantly diminished," *id.* at 457. Taken on its own, this circumstance would only appear to justify a search based upon reasonable suspicion, similar to that involved in *Knights*. We also determined, however, that "a home visit is far less intrusive than a *probation search*," and, therefore, that "probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*." *Id.* at 462.

Both of these cases, like *Griffin* and *Knights* themselves, considered the validity of particular searches, rather than search conditions themselves. We have, in fact, never evaluated the conformity of special conditions of probation or supervised release with the Fourth Amendment.[5] Nor does *Griffin* itself provide guidance as to how to determine the reasonableness of such search conditions. We

therefore examine how courts have analyzed other "special needs" searches in order to derive the applicable Fourth Amendment standard.

## B. Other "Special Needs" Searches

Considering the contours of special needs searches is instructive as to the permissible extent of such searches under the Fourth Amendment. It also assists in discerning the kind of search to which computer monitoring bears the closest resemblance.

The government insisted both in its brief and at oral argument that drug testing conditions constituted an "apt analogy to the computer monitoring condition imposed here." The defendant countered that, unlike drug testing, the monitoring in this case may be "continuous"; furthermore, "the scope of the information that is obtained through a drug test is narrowly tailored to the particular question of whether the offender has used narcotics," while computer monitoring may "uncover a host of personal, non-criminal information that falls far outside the scope of what the

---

5. The closest we have come to doing so is in considering whether a district court abused its discretion in applying certain search conditions. *See United States v. Germosen*, 139 F.3d 120 (2d Cir.1998). In *Germosen*, a travel agent who had conspired to defraud the Airlines Reporting Corporation claimed that "the district court abused its discretion by imposing a special condition of supervised release that Germosen be subject to searches of his person and property." *Id.* at 129. In evaluating the merits of this position, we looked to the criteria set forth in the United States Sentencing Guidelines (the "Guidelines") for imposing such special conditions. Under the Guidelines, "A district court may impose special conditions of supervised release to the extent that they are 'reasonably related' to (i) the nature and circumstances of the offense and the history and characteristics of the defendant, and (ii) the purposes of sentencing, including the need to afford adequate deterrence, to protect the public from

further crimes of the defendant, and to provide the defendant with needed training or treatment." *Id.* at 131; U.S.S.G. § 5D1.3(b). The special conditions must also involve "no greater deprivation of liberty than is reasonably necessary" for these purposes. *Germosen*, 139 F.3d at 131; U.S.S.G. § 5D1.3(b). In *Germosen*, the district court based imposition of the search condition upon the fact that Germosen had obstructed justice and persistently lied with respect to his financial records, and, at sentencing, orally limited searches to those "necessary to secure information ... regarding [Germosen's] finances." *Id.* at 131. We therefore upheld the special condition as both "reasonably related" and "reasonably necessary." *Id.* at 131–32. *Germosen* did not consider the Fourth Amendment's implications for probationary searches and thus does not control our outcome here, where neither party relies upon the Guidelines.

monitoring condition is intended to accomplish."

Ultimately, the attempt to establish the best point of comparison with all computer monitoring may prove futile, because computers serve a multiplicity of functions, from mailbox (in sending and receiving e-mail), to telephone (in accessing particular IP addresses and web pages),[6] to financial systems (by both permitting on-line payment mechanisms and recording personal financial data), to home offices, to storage bins. It is, therefore, not the nature of computers themselves that determines what type of search occurs, but the manner in which particular monitoring software or techniques operate and the kind of computer activity that they target. The available analogies do, however, provide some assistance in assessing the nature and scope of a potential intrusion into computer privacy.

The context in which the doctrine of "special needs" has been most thoroughly developed is that of drug testing. This example will therefore provide the focal point of our analysis. Because this Circuit has applied a "special needs" framework in evaluating the permissibility of DNA testing, and because computer searches in the employment context demonstrate relevant distinctions between the levels of privacy that may be involved in disparate types of computer use, we briefly consider those "special needs" cases as well.

### i) Drug Testing

In a variety of "special needs" contexts, including education and certain kinds of

employment, the Supreme Court has confirmed that suspicionless drug testing does not violate the Fourth Amendment, a principle that several circuits have extended to probationers as well. The unifying characteristics of permissible testing include a reduced expectation of privacy on the part of the testing subject, random or otherwise non-discretionary implementation of the testing program, narrowness of the scope of testing, and an important governmental interest that testing effectively furthers. What is absent is any necessity to demonstrate individualized suspicion.

Most recently, the Court assessed the constitutionality of a public school's requirement that all students engaging in extracurricular activities "take a drug test before participating ... [and] submit to random drug testing while participating ... [and] agree to be tested at any time upon reasonable suspicion." *Bd. of Educ. v. Earls*, 536 U.S. 822, 826, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (providing a framework for assessing the validity of school drug testing programs). Applying "a fact-specific balancing of the intrusion on the children's Fourth Amendment rights against the promotion of legitimate governmental interests," *Earls*, 536 U.S. at 830, 122 S.Ct. 2559, the Court upheld the school's rule. It looked first to the privacy interest involved, *id.* at 831–32, 122 S.Ct. 2559, then to the character and degree of the intrusion, *id.* at 832–33, 122 S.Ct. 2559, and, finally, to the "nature and immediacy of the government's concerns and the efficacy of the [p]olicy in meeting them," *id.* at

---

6. We have employed this comparison between a computer and a telephone in several previous cases. In *United States v. Sofsky*, 287 F.3d 122 (2d Cir.2002), we noted, in striking down a special condition forbidding the defendant from using a computer or the Internet without first seeking approval from his probation officer, that " 'although a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.' " *Id.* at 126 (quoting *United States v. Peterson*, 248 F.3d 79, 83 (2d Cir.2001)).

834, 122 S.Ct. 2559. The "special needs" logic most explicitly characterized the first and third prongs of this inquiry, affecting the Court's assessment both of the school children's reasonable expectation of privacy and of the type of interest that the government possessed.

In evaluating the nature of the invasion of privacy, the Court observed that "the 'degree of intrusion' on one's privacy caused by collecting a urine sample 'depends upon the manner in which production of the urine sample is monitored.'" *Id.* at 832, 122 S.Ct. 2559. In this instance, the Court determined that neither the physical nor the pharmacological intrusions were particularly significant; the faculty monitor did not directly observe the student's micturition but instead listened from outside the bathroom stall, *id.* at 832–33, 122 S.Ct. 2559, the "urinalysis tests [were] designed to detect only the use of illegal drugs ... not medical conditions or the presence of authorized prescription medicines," *id.* at 826, 122 S.Ct. 2559, school officials were apprised of the results only on a need-to-know basis, *id.* at 833, 122 S.Ct. 2559, and the "tests results [were] not turned over to any law enforcement authority," *id.* at 833, 122 S.Ct. 2559, thus confirming that the "special need" involved went beyond law enforcement interests.

Finally, when considering the method that the school district had employed in achieving its goal of "preventing, deterring, and detecting drug use," the Court determined that "testing students who participate in extracurricular activities is ... reasonably effective," noting that "reasonableness under the Fourth Amendment does not require employing the least intrusive means." *Id.* at 837, 122 S.Ct. 2559.

The Court has also upheld suspicionless drug testing of railroad employees and customs officials involved in drug interdic-

tion. *See Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). *Skinner* involved regulations, which the Federal Railroad Administration had promulgated to implement the Federal Railroad Safety Act, 45 U.S.C. § 431(a), mandating that all crew members and other designated employees be tested for drug or alcohol use following an accident. *Skinner,* 489 U.S. at 609, 109 S.Ct. 1402. Rejecting the claim that, in such circumstances, search criteria should be based upon individualized suspicion, the Court explained, paraphrasing the special needs rationale, that, "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Id.* at 624, 109 S.Ct. 1402. The Court then determined that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety," *id.* at 627, 109 S.Ct. 1402, and that, "[b]y contrast, the Government interest in testing without a showing of individualized suspicion is compelling," largely because the deterrence and detection purposes served by this testing would further railroad safety, *id.* at 628–29, 109 S.Ct. 1402.

In *Von Raab,* decided the same day, Justice Kennedy, again writing for the Court, reiterated that, "[w]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to re-

quire a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. 1384. The majority emphasized that imposing a warrant requirement on the drug testing of customs officials who were directly involved in drug interdiction or handled firearms would provide hardly any additional protection for privacy, because covered customs officials—like probationers subject to a search condition—would be aware of the regulations mandating drug testing of all who applied for such positions, and those implementing the drug testing program would not be permitted to exercise any discretion. *Id.* at 667, 109 S.Ct. 1384. The Court further held that "Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty ... have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test," *id.* at 672, 109 S.Ct. 1384, an expectation of privacy that was outweighed by the government's "compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment," *id.* at 670, 109 S.Ct. 1384, and in "prevent[ing] the promotion of drug users to positions that require the incumbent to carry a firearm," *id.* *Von Raab* also noted that the procedures outlined for drug testing "significantly minimize the program's intrusion on privacy interests" by avoiding "direct observation of the act of urination" and specifying that "urine samples may be examined only for the specified drugs." *Id.* at 672 n. 2, 109 S.Ct. 1384. Finally, the Court considered the argument that the testing program might be ineffectual "because employees may attempt to deceive the test by a brief abstention before the test date, or by adulterating their urine specimens." *Id.* at 676, 109 S.Ct. 1384. Although admitting that drugs do become undetectable in, at most, a few weeks, the majority opined that "no employee reasonably can expect to deceive the test by the simple expedient of abstaining after the test date is assigned," and, therefore, concluded that "the program [bore] a close and substantial relation to" the government's goal. *Id.*

These cases notwithstanding, the Court has not invariably approved the use of such drug testing, for two main reasons. First, the Court has been reluctant to ratify implausible or overbroad assertions of "special needs." *See, e.g., Chandler v. Miller*, 520 U.S. 305, 318–22, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (striking down a drug testing regime imposed upon candidates for state office in Georgia because "the proffered special need for drug testing" was not substantial where Georgia "assert[ed] no evidence of a drug problem among the State's elected officials, [and] those officials typically do not perform high-risk, safety-sensitive tasks," and concluding that the "need revealed, in short, is symbolic, not 'special' "); *Von Raab*, 489 U.S. at 677–78, 109 S.Ct. 1384 (remanding for a determination of whether a third category of employee subject to testing "encompasses only those Customs employees likely to gain access to sensitive information," as would be justified by the special need of protecting classified information). Secondly, the Court has emphasized that the "special need" involved must not be isomorphic with law enforcement needs, but rather go beyond them. *See, e.g., Ferguson v. City of Charleston*, 532 U.S. 67, 79–80, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (striking down a state hospital policy implementing procedures for testing certain pregnant women for drug use, and stating that "[t]he critical difference between [*Chandler, Acton, Skinner*, and *Von Raab*] and this [case] ... lies in the nature of the 'special need' asserted as justification for the warrant-

less searches. In each of those earlier cases, the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement. . . . In this case, however, the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment."); *Indianapolis v. Edmond*, 531 U.S. 32, 42, 47, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (invalidating an Indianapolis drug checkpoint program because its "primary purpose" was "to uncover evidence of ordinary criminal wrongdoing," and observing that, "[w]hile reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs . . . cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue").

These precedents demonstrate that the Court has applied three principal criteria in assessing whether a "special need" justifies a search. First, the government must allege a "special need," the importance of which derives both from the particular context in which it seeks to implement searches—whether that of the vulnerability of school children or the sensitive employment situation of certain customs officials—and what the searches are designed to discover—most notably, the perils occasioned by illegal drug use. Secondly, those subject to the search must enjoy a diminished expectation of privacy, partly occasioned by the special nature of their situation, and partly derived from the fact that they are notified in advance of the search policy. Third, the search program at issue must seek a minimum of intrusiveness coupled with maximal effectiveness so that the searches "bear a close and substantial relationship" to the government's "special needs."

The Supreme Court has, notably, refrained from addressing whether the "special needs" of the probation system justify imposing drug testing conditions in conjunction with sentences of probation. Although this Circuit also has not explicitly decided whether, in accordance with the "special needs" logic, it is permissible under the Fourth Amendment to impose a drug testing condition as part of a sentence of probation or supervised release, and we do not decide this issue today, other circuits have upheld such measures, and the Sentencing Guidelines now require sentencing courts to implement them in most instances.[7] *See, e.g., United States v. Wright*, 86 F.3d 64, 65 (5th Cir.1996) (citing *Griffin* for the proposition that "[p]ersons on supervision do not enjoy absolute liberty but only conditional liberty dependent upon observance of special conditions" in upholding a drug testing condition upon supervised release).

### ii) DNA Collection

Several circuits, including our own, have considered and upheld statutes requiring convicted sex offenders to submit a blood sample for analysis and inclusion in DNA data banks. *See, e.g., Roe v. Marcotte*, 193 F.3d 72 (2d Cir.1999); *Boling v. Romer*, 101 F.3d 1336 (10th Cir.1996); *Jones v.*

---

7. *See* U.S.S.G. § 5B1.3(a)(5) ("For any offense, the defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests thereafter (as determined by the court) for use of a controlled substance, but the condition stated in this paragraph may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable information indicates a low risk of future substance abuse by the defendant . . . .")

*Murray,* 962 F.2d 302 (4th Cir.1992). *But see United States v. Kincade,* 345 F.3d 1095 (9th Cir.2003), *vacated and reh'g en banc granted,* 354 F.3d 1000 (9th Cir.2004). Our decision in *Marcotte* explicitly employed a "special needs" logic. As we summarized this approach, "[i]n ["special needs"] cases, a significant governmental interest, such as the maintenance of institutional security, public safety, and order, must prevail over a minimal intrusion on an individual's privacy rights to justify a search on less than individualized suspicion." *Marcotte,* 193 F.3d at 78. Examining the governmental interest involved, we observed the high rate of recidivism among sexual offenders and emphasized that "the statute's requirement that imprisoned sexual offenders provide a DNA sample will deter these individuals from committing future offenses of a similar nature." *Id.* at 79. We also noted, as the Supreme Court did in its drug testing cases, that the lack of discretionary application of the procedure minimized the concerns traditionally underlying the requirements of probable cause and reasonable suspicion. *Id.* at 79–80. Finally, we maintained that the intrusion upon privacy effected by a blood test was minimal, and that, although the ensuing analysis of the data might be more invasive, the statute in question provided adequate safeguards against collection of unnecessary physiological information. *Id.* at 80.

### iii) Computer Searches in the Employment Context

Some courts have also addressed the constitutionality of examinations of government employees' computers under the "special needs" justification for certain employment-related searches articulated by the plurality in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). In *O'Connor,* the plurality determined that "special needs" obviated the

necessity for a warrant or probable cause in employment contexts with respect to "legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct," *id.* at 725, 107 S.Ct. 1492, and, therefore, that "public employer intrusions on the constitutionally protected privacy interests of government employees ... should be judged by the standard of reasonableness under all the circumstances," *id.* at 725–26, 107 S.Ct. 1492. Applying this standard, the Fourth Circuit upheld a search involving an entry into the office of an employee of the Foreign Bureau of Information Services ("FBIS") in order to retrieve his hard drive. *See United States v. Simons,* 206 F.3d 392 (4th Cir.2000). The court determined that, although Simons possessed a legitimate expectation of privacy in his office, *id.* at 399, the search was reasonable because it was "carried out for the purpose of obtaining evidence of suspected work-related employee misfeasance," *id.* at 400 (internal quotation marks omitted). At the same time, however, the court distinguished Simons's privacy interest in his office from that in the Internet files he had downloaded. The FBIS Internet policy emphasized that employees' Internet and e-mail use and file transfers would be monitored, and, therefore, Simons lacked a legitimate expectation of privacy in these materials. *Id.* at 398–99. Those remotely accomplished searches of the materials he had accessed through the Internet therefore did not violate the Fourth Amendment. *Id.*

### C. "Reasonable Suspicion" Requirement

██ The government asserts, in the alternative, that "reasonable suspicion" is present in this case because, "by virtue of the fact that the monitoring condition is 'reasonably related' to the goals of Lifsh-

itz's probation, a level of individualized suspicion is built into the condition." This argument responds to Lifshitz's claim that, after *Knights*, all probationary searches—including those aimed at monitoring and rehabilitation and therefore justified by the "special needs" of the probation system—must be based upon "reasonable suspicion." We do not think, however, that the body of case law supports the proposition that "reasonable suspicion" can be grounded solely in a defendant's status as a convicted sex offender, or convicted fraudulent telemarketer, or any other variety of convicted criminal.

Although "reasonable suspicion" constitutes a less stringent standard than "probable cause," the two are continuous along a spectrum of individualized suspicion. In *Griffin*, the Supreme Court noted that "we use 'probable cause' to refer to a quantum of evidence for the belief justifying the search, to be distinguished from a lesser quantum such as 'reasonable suspicion.'" *Griffin*, 483 U.S. at 877 n. 4, 107 S.Ct. 3164. While the concepts of "reasonable suspicion" and "probable cause" are "fluid" and not susceptible of precise definition, "[t]he principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts ... amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Suspicion, to be reasonable, therefore necessitates not only a focus upon a particular person, but also concentration on a specific series of events.

In *Marcotte*, we explicitly distinguished searches based solely on an individual's status as a convicted sex offender from searches based upon at least some level of individualized suspicion. *Marcotte*, 193 F.3d at 76–77 (considering whether the DNA-collection statute at issue "violates the Fourth Amendment because it compels [the defendant] to produce evidence that may be used in future criminal investigations merely because of his status as a convicted sex offender and without requiring a showing of probable cause or reasonable suspicion that he has committed a particular crime"). There is, indeed, a nearly universal consensus that the criminal status of the probationer cannot, viewed on its own, be sufficient to support a determination that "reasonable suspicion" exists;[8] in other words, to find "reasonable suspicion," it is not enough to suspect that someone has committed a particular crime only because of a prior criminal conviction. For these reasons, we decline to assess a probation condition imposed by a sentencing court according to a "reasonable suspicion" standard.

## D. Computer Monitoring of Convicted Sex Offenders

This Court has previously confronted a case in which an individual, who pled guilty to receiving child pornography, challenged

---

8. A decision of the Supreme Court of Connecticut appears to provide the only exception. In *Connecticut v. Smith*, 207 Conn. 152, 540 A.2d 679 (1988), the court upheld a probation condition requiring drug testing that was imposed a year after the probationer's sentence. In doing so, the court determined that, although the urinalysis constituted a search, it was permissible, because "reasonable suspicion" existed. *Id.* at 691. Even in this case, however, some of the aspects of what is conventionally considered "reasonable suspicion" were present, because the probationer had, prior to imposition of the drug testing condition, given the probation officer every reason to believe that he was using illegal substances. *Id.* at 690 ("Despite the warning by his probation officer not to use drugs, including marihuana, [the probationer] said he would use marihuana and did so.").

a condition of probation prohibiting access to computers or the Internet. *See United States v. Sofsky*, 287 F.3d 122 (2d Cir. 2002). Although we recognized that, under certain circumstances, such a condition may be "reasonably related to the purposes of sentencing," we held in that case that it resulted in a deprivation of liberty "greater ... than is reasonably necessary." *Id.* at 126. As an alternative, we suggested that "a more focused restriction, limited to pornography sites and images, can be enforced by unannounced inspections of [a probationer's] premises and examination of material stored on his hard drive or removable disks." *Id.* at 127. In this case, we must decide whether the computer monitoring condition imposed upon Lifshitz constitutes such a "more focused restriction," or does itself result in a deprivation of privacy "greater ... than reasonably necessary." In doing so, we will apply the "special needs" approach derived from the intersection of *Griffin* and the Supreme Court's drug testing cases.

■■ By following the drug testing example, we acknowledge that, as the government argued, a particularly apt analogy to monitoring for computer-related sex offenses is searching for illegal drug use. As we have previously observed in the DNA collection context, there is a high rate of recidivism among sex offenders, *Marcotte*, 193 F.3d at 79, like drug users. Regular searches of a probationer's computer, on the one hand, and of his urine or sweat, on the other, can deter him from engaging in impermissible conduct. *Cf. Von Raab*, 489 U.S. at 676, 109 S.Ct. 1384 (espousing the Customs Service's goal of "deterring drug users from seeking promotion to sensitive positions"). At the same time, however, the intrusion on privacy that computer monitoring occasions must, like that resulting from drug testing,

remain narrow. It is this narrowness that the condition as it stands may well lack.

### i) Government's Interest

The "special needs" that the probation system implicates are, in this case, enhanced by combination with the government's interest in eradicating child pornography. As the Supreme Court stated over two decades ago, "[i]n recent years, the exploitative use of children in the production of pornography has become a serious national problem." *New York v. Ferber*, 458 U.S. 747, 749, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The rise of the Internet has only increased the availability of such materials and augmented the accompanying problems of child victimization. *See* James Brooke, *Sex Web Spun Worldwide Traps Children*, N.Y. Times, Dec. 23, 2001, at A12 ("[T]he Internet and cellular telephone explosion has been a boon to adults who prey on young people for sex.").

Two of the unique characteristics of probation that the Court relied upon to justify "special needs" searches in *Griffin* are particularly important in this case. Computer monitoring would, in this instance, serve a substantial deterrent purpose, encouraging Lifshitz to refrain from returning to the behavior in which his family tried in vain to stop him from engaging and which the district court found Lifshitz sufficiently unable to control to justify a downward departure based upon diminished capacity. Likewise, computer monitoring could further Lifshitz's welfare—rather than simply serve the needs of the state—and help to rehabilitate the probationer, as the district court appears to have contemplated. Additionally, in *Marcotte*, our "special needs" case involving DNA collection, we relied upon studies "indicating a high rate of recidivism among sexual offenders," 193 F.3d at 79,

and observed that the "requirement that imprisoned sexual offenders provide a DNA sample will deter these individuals from committing future offenses of a similar nature," *id.; see also supra* Section II(B)(ii). The government has, therefore, demonstrated a substantial interest in supervising Lifshitz's computer use through monitoring in order to further its probationary goals of rehabilitation and deterrence.

### ii) Probationer's Expectation of Privacy

 Individuals generally possess a reasonable expectation of privacy in their home computers. *See, e.g., Trulock v. Freeh,* 275 F.3d 391, 403 (4th Cir.2001); *Guest v. Leis,* 255 F.3d 325, 333 (6th Cir. 2001) ("Home owners would of course have a reasonable expectation of privacy in their homes and in their belongings—including computers—inside the home."); *see also Leventhal v. Knapek,* 266 F.3d 64, 73 (2d Cir.2001) (holding that an employee "had a reasonable expectation of privacy in the contents of his office computer"). They may not, however, enjoy such an expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient. *See Guest,* 255 F.3d at 333 (asserting that "Users would logically lack a legitimate expectation of privacy in the materials intended for publication or public posting. They would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose expectation of privacy ordinarily terminates upon delivery of the letter.") (internal citations and quotation marks omitted). This distinction is confirmed by the "special needs" cases that other courts have decided involving computer monitoring in the employment context. *See supra* Section II(B)(iii).

While the extent to which a probationer's privacy interests are implicated depends on the type of monitoring implemented—whether investigating local computer activity or materials sent through an Internet Service Provider to another machine—they are, in any event, reduced by the very fact that he remains subject to federal probation. *See Reyes,* 283 F.3d at 457.

### iii) Scope and Efficacy of the Condition

We must assess the necessary scope of the monitoring condition in light of the "special needs" articulated in this particular case, those of rehabilitating Lifshitz and ensuring that he does not inflict further harm on the community by receiving or disseminating child pornography during the probationary period. In order to comply with the requirements of the Fourth Amendment, the monitoring condition must be narrowly tailored, and not sweep so broadly as to draw a wide swath of extraneous material into its net. Drug testing procedures provide the relevant point of comparison here. As the Supreme Court has consistently emphasized, urinalysis and other means of determining drug use should be precisely targeted to ascertain only whether an individual has used illegal substances. *See supra* Section II(B)(i). Furthermore, if other information is inadvertently gathered (such as whether a subject of testing eats beets), those monitoring compliance should remain conscientiously unaware of that data. *See supra* Section II(B)(i).

There is very little information in the record about what kind of monitoring the probation condition authorizes. As it stands, the condition specifies only that "the defendant shall consent to the installation of systems that enable the probation

office or designee to monitor and filter computer use, on a regular or random basis, on any computer owned or controlled by the defendant." According to Chief U.S. Probation Officer Chris Stanton's letter of April 14, 2003, "the use of monitoring devices is generally less intrusive than a 'full-blown' search of the computer. Most monitoring devices [with] which we are familiar capture information about websites visited or compile random 'snapshots' of material accessed." The lawyer for the government confirmed this impression at oral argument. Yet the government uniformly refrained from consenting to limit its monitoring activities in a particular manner, citing pragmatic concerns and ongoing developments in technology.

A brief survey of methods of monitoring, however, reveals that even the varieties of products and techniques currently available diverge vastly in their breadth, and in their implications for computer users' privacy. There are two principal axes along which monitoring methods can be distinguished. First, some monitoring uses software installed on an individual's personal computer, whereas other monitoring relies on records from the Internet Service Provider ("ISP"), through whom an account user's requests for information or e-mails are routed.[9] The former type of monitoring might be more conducive to investigating all of a probationer's computer-based activities, including those performed locally without connection to the Internet or any network—such as Lifshitz's word processing activities or the financial accounting for his car-repossession business—whereas the latter would be limited to transmissions mediated by the ISP. Second, some software focuses attention upon specific types of unauthorized materials, whereas other kinds monitor all activities engaged in by the computer user.[10] These distinctions may be material to determining whether the scope of the monitoring condition's infringement on privacy is commensurate with the "special needs" articulated in this case. Constant inspection of the documents that Lifshitz creates on his

9. One monitoring program mediated by ISPs has been implemented in Bexar County, Texas. Ihosvani Rodriguez, *Three Sex Offenders Caught Seeking Internet Porn; Trio Had Agreed To Be Under the Authority of Cyber–Watchdogs*, San Antonio Express–News, Dec. 28, 2001, at 1A. Under this system,

> [P]robationers must sign up with a local Internet provider specified by the courts and pay the monthly access fee. As part of its agreement with the county, the company keeps tabs on the offenders' online activities and restricts access to sex-related sites or areas explicitly forbidden as part of their probation or parole. Access also is denied to newsgroups and to chat rooms that children may visit.

*Id.*

10. On the more comprehensive side, some monitoring software boasts the ability to track all of an individual's uses of his or her computer through what is called "keystroke" monitoring. *See* Matt Richtel, *A Different Type of Computer Monitor*, N.Y. Times, Aug. 27, 1998, at G3 (explaining that "[a] new generation of software is emerging to permit employers to record not just which Web sites employees browse, but also which programs they use, memos they write, E-mails they send—in short, every keystroke"). By contrast, other software may be more attuned to detecting specific impermissible activities. *See* John Schwartz, *Internet Leash Can Monitor Sex Offenders*, N.Y. Times, Dec. 31, 2001, at C1 (describing how, with a program called Cyber Sentinel, "[w]henever the system detects suspicious activity, it captures whatever is on the screen at the time, stores it on the user's hard drive and sends an e-mail message to the county probation officer," and explaining that the "program works by monitoring everything that crosses the computer screen and comparing the sites visited and the words appearing on the screen with a database of sexually oriented sites and phrases").

computer might be more like searching his diary or inspecting his closets than it is like the highly targeted diagnosis accomplished by drug testing. *See, e.g., Trulock,* 275 F.3d at 403 ("Trulock's password-protected files are analogous to the locked footlocker inside the bedroom. By using a password, Trulock affirmatively intended to exclude Conrad and others from his personal files.... Thus, Trulock had a reasonable expectation of privacy in the password-protected files ...."). By contrast, software that alerted a probation officer only when Lifshitz was engaging in impermissible communications over e-mail or the Internet would bear much greater resemblance to screening a probationer's urine for particular drugs—as opposed to investigating a sample to ascertain all medical conditions from which the individual suffered or to figure out his or her favorite foods.

One distinction that we do not wish to overemphasize, however, is that between continuous and more discrete monitoring. In the drug testing context, courts have not paid particular attention to this type of differentiation. For example, the "sweat patch," a device that "operates like a large bandage that absorbs sweat from its wearer," *United States v. Alfonso,* 284 F.Supp.2d 193, 196 (D.Mass.2003), which has been used by probation departments as an alternative to urinalysis since 1997, *id.,* permits continuous monitoring of a probationer's perspiration. At least one court has, however, deemed the "sweat patch" in some respects less intrusive upon an individual's privacy than urinalysis. *See id.* at 196 ("[T]he sweat patch poses fewer intrusions on the offender's privacy and schedule. An offender wearing a sweat patch need not be monitored as he urinates, nor must he face random urine tests that may interfere with his work

schedule. Instead, he can simply come into the Probation Office on a scheduled basis for removal of his patch and application of a new one."). Like the sweat patch, continuous but narrowly circumscribed monitoring via software might present less of an intrusion into Lifshitz's privacy than computer searches by the probation officer.

Although the Supreme Court has observed that the reasonableness inquiry under the Fourth Amendment "does not require employing the least intrusive means," *Earls,* 536 U.S. at 837, 122 S.Ct. 2559, the means employed must bear "a close and substantial relation," *Von Raab,* 489 U.S. at 676, 109 S.Ct. 1384, to the government's interest in pursuing the search. It is not clear that the monitoring condition, as currently structured, ensures that "close and substantial relation."

Furthermore, the efficacy of the monitoring condition is not pellucidly clear. It is well known that experienced computer users are quite resourceful in circumventing the software employed, and federal officials have even publicly remarked upon this fact. *See* Matt Richtel, *Barring Web Use After Web Crime,* N.Y. Times, Jan. 21, 2003, at A1 (explaining that the individual in charge of the computer monitoring of probationers in the Eastern District of New York "not[ed] that a sophisticated computer user can probably find ways to evade it" and reporting that the chief security strategist for Microsoft, a former federal prosecutor, stated that monitoring methods "can be easily circumvented"). Although the government rejected the suggestion that it use filtering rather than monitoring, claiming that the former technique could too easily be thwarted, it is, therefore, not obvious that monitoring would be immune from the same problem.

The scope of the monitoring condition may, therefore, be overbroad, and it is not clear from the record as it stands whether or not monitoring is sufficiently effective to justify its implementation.[11]

## CONCLUSION

Although the Fourth Amendment offers protection against searches of home computers, the "special needs" of the probation system are sufficient to justify conditioning Lifshitz's probation upon his agreement to submit to computer monitoring. The scope of the computer monitoring condition as it stands may, however, be overbroad. We therefore vacate the condition and remand the case to the district court to evaluate the privacy implications of the proposed computer monitoring techniques as well as their efficacy as compared with computer filtering, and then to impose a condition consistent with this opinion.

11. On remand, we leave the resolution of this issue to the discretion of the district court. It might wish—through a hearing or other appropriate procedures—to evaluate the scope and efficacy of the methods of computer monitoring that the probation office intends to employ. If it appears that filtering is no less effective than monitoring, the court might decide to revise the condition to eliminate the first sentence and instead permit filtering rather than monitoring. If, on the other hand, there are demonstrable advantages to monitoring, the court might instead prefer to ensure that a narrower but still effective condition is imposed, if one is reasonably available. For example, in light of the discussions of the varying privacy interests involved and the range of methods by which monitoring may be accomplished, *supra* b(ii)-(iii), two ways in which the condition might be more narrowly tailored would be by limiting it to Internet-related activity and e-mail and by implementing monitoring software that searches for particular suspect words and phrases rather than recording all varieties of computer-related activity. This is not to suggest that the condition must necessarily be restricted to the monitoring of online conduct.

It appears from our brief review of available software that the kind of monitoring described would be technologically feasible. Furthermore, if at some point in the future the defendant presents clear evidence that less intrusive, but still effective, methods of controlling his computer use have become technologically available, nothing we decide here precludes the district court from modifying its order. The district court is, however, in a better position than we are to assess the range of available alternatives. Because Lifshitz is being sentenced to probation, it seems necessary to determine, at this time, the conditions of that probation and to base that determination, in the first instance, on the state of technology and other practical constraints as they currently exist. Were this, however, a case involving supervised release, or if there were any reasons why the commencement of the defendant's term of probation would be substantially delayed, it might well be prudent for the district court to postpone the determination of the supervised release or probation conditions until an appropriate later time, when the district court's decision could be based on then-existing technological and other considerations.