**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3088

_____

UNITED STATES OF AMERICA

v.

JASON SHEPPARD,
                                Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-13-cr-00278-001)
District Judge:  Honorable Cathy Bissoon

_____

Submitted May 11, 2021

Before:  McKEE, RESTREPO, and FUENTES, *Circuit
Judges*.

(Opinion Filed: November 3, 2021)

Michael J. Khouri
Khouri Law Firm, APC
2222 Martin, Suite 215
Irvine, CA 92612
        *Counsel for Appellant*


Adam N. Hallowell
Laura S. Irwin
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge.*

In August 2019, Jason Sheppard began serving a three-year term of supervised release in connection with a 2016 guilty plea for mail fraud. During the first year of his supervision, Sheppard learned that his girlfriend and his assigned probation officer were engaged in an alleged "personal relationship." Sheppard moved for early termination of his term of supervised release under 18 U.S.C. § 3583(e)(1) in September 2020. The District Court, without holding an evidentiary hearing, denied Sheppard's motion. For the reasons set forth below, we will affirm.

## I.

## A.

In October 2013, a grand jury indicted Jason Sheppard on seven counts of mail fraud in violation of 18 U.S.C. § 1341. Sheppard pleaded guilty to one count, and judgment was entered against him in December 2016. The District Court dismissed the remaining six counts. Sheppard received a sentence of 30-months imprisonment, with three years of supervised release, and was ordered to pay a special assessment in addition to $ 11,749.06 in restitution.[1] On August 26, 2019, he was released to serve his term of supervised release. Sheppard claims that he has "complied with the conditions of supervised release and has become a productive member of the public" since his release from custody. J.A. 10. For example, he secured employment and is "in the process of developing his business ventures to start a new life." J.A. 10.

According to Sheppard, in approximately March 2020, he learned that his then girlfriend and his assigned probation officer had developed a "personal relationship." J.A. 10. This purported "personal relationship" included the exchange of dozens of text messages, largely centering around discussions

---

[1] While Sheppard has since paid the special assessment, *see* J.A. 50, it is unclear from the record whether Sheppard has paid his restitution in full. *Compare* J.A. 12 ("Defendant . . . has been working toward making restitution.") with Appellant's Br. 5 ("Sheppard has paid restitution in full.") (citing J.A. 50).

3

of the probation officer's romantic life.  For example, Sheppard's probation officer allegedly texted Sheppard's girlfriend:

- Questions soliciting the girlfriend's perspective on his former paramour's behavior, *see, e.g.*, J.A. 20 ("Why is she posting everyday.  Never does that"); J.A. 22 ("Last one.  How do you love someone a week ago then dump them via text at age 52"); J.A. 29 ("Do you think there is someone else?"); J.A. 29 ("Is she just 🥜");[2] J.A. 34 ("Why hasn't she blocked me"); J.A. 35 ("What should I do");

- His thoughts and feelings concerning his former paramour, *see, e.g.*, J.A. 23 ("I miss her.  Being able to call or text."); J.A. 43 ("It hurts to get dumped over a text"); J.A. 43 ("Half of me is gone");

- A photograph of his former paramour's house, *see, e.g.*, J.A. 31;

---

[2]  As relevant here, the "peanuts" emoji can be used to indicate "crazy."    *See* Peanuts, Emojipedia.org, https://emojipedia.org/peanuts/ (last visited October 26, 2021); *see also* J.A. 29 (Sheppard's girlfriend responding to the probation officer's use of the "peanuts" emoji with a text message reading, "Yes.  And you love the *crazy* lol") (emphasis added).

4

- Screenshots of text messages concerning his former paramour's perspective on her relationship with the probation officer, *see, e.g.*, J.A. 33, 36;

- The status of his marriage, *see, e.g.*, J.A. 23 ("Trying [to streamline the divorce]. But there is another person involved.");

- Multiple requests for the girlfriend to talk on the telephone, *see, e.g.*, J.A. 20 ("Call me when you get a minute."); J.A. 35 ("Can [you] please call me"); J.A. 35 ("Can I call for 5 min").[3]

Sheppard's girlfriend purportedly responded in kind, engaging Sheppard's probation officer in texting conversations during which she offered him advice on how to handle, and cope with, his romantic problems. *See, e.g.*, J.A. 24 ("If you just hang in there and don't poke the bear, she will text. She wants you to chase her"); J.A. 27 ("Ok so I Facebook stocked [sic] her profile."); J.A. 35 ("Call me tomorrow. Please get some rest ok?!"); J.A. 38 ("Does she think if you get divorced that you will turn around and marry her the next day").

---

[3] Sheppard asserts that his probation officer and then girlfriend indeed spoke telephonically. According to Sheppard, these telephone calls were "substantial, with some lasting over an hour long." J.A. 10 (citing J.A. 45).

5

According to Sheppard, "[n]one of the text messages [between his probation officer and his then girlfriend] involved [him], his rehabilitation, or the detrimental effect the secret relationship would have on [his] rehabilitation." J.A. 10.[4] However, the probation officer purportedly suggested in at least one text message exchange that his job required him to have a "tolerance for bullshit." J.A. 41 (Girlfriend: "Everyone hates her but you? . . . . That says a lot about your tolerance for bullshit my friend[.]" Probation Officer: "Look what I do[]").

**B.**

On September 25, 2020, Sheppard filed a motion for early termination of supervised release pursuant to 18 U.S.C. § 3583(e). Sheppard argued that his probation officer's "personal relationship" with his girlfriend – which "caused the break up of what [Sheppard] perceived to be a lifelong commitment" with his girlfriend – was negatively impacting his rehabilitation, thereby undermining any utility in continued supervision. J.A. 10-11. Sheppard also claimed that:

> The probation officer was never
> concerned with [his] rehabilita-
> tion and appears to use his posi-
> tion for his own personal

[4] It is unclear from the record the extent to which the communications between Sheppard's probation officer and then girlfriend occurred on a government phone, issued to the probation officer by the United States Probation Office for official business. *See* J.A. 11, 47.

6

interests. Such conduct is a gross violation of code of conduct for probation and pretrial services officers found in *Guide to Judiciary Policy*, Vol. 2A, Ch. 3, § F(2)(c) – F(3), which prohibits a probation officer from performing any official duties in which he or she has a conflict or a personal bias or prejudice concerning a party. The probation officer embedded himself in a situation where he exercised authority over [his] rehabilitation and used that authority to develop a personal relationship with the former girlfriend. [His] rehabilitation was threatened rather than facilitated by the probation officer, and he has lost his trust in the United States Probation Office to assist in his rehabilitation.

J.A. 12. He also urged that the District Court grant him early termination in "the interest of justice," due to the fact that the probation officer acted "counter to the purpose of supervised release in rehabilitating [him]" and "jeopardized [his] supervised release by alienating [him] from a key relationship in his rehabilitation efforts." J.A. 13.

7

In support of Sheppard's motion, his counsel submitted a declaration that included three exhibits: 1) images of the alleged text messages between Sheppard's girlfriend and his probation officer; 2) a call log "indicating that [the girlfriend] spoke with [Sheppard's] probation officer on the phone for 80 minutes on June 6, 2020"; and 3) an email that Sheppard's counsel sent to the probation officer's supervisor, in which he requested "copies of all communications (text messages, emails etc[.])" between the probation officer and the girlfriend. J.A. 17-18, 47. Counsel also requested that the District Court grant Sheppard an evidentiary hearing, at which he intended to call as a witness Sheppard's therapist to "testify to how [Sheppard's] rehabilitation and overall wellbeing has been burdened by the probation officer's conduct." J.A. 18. Additionally, Sheppard's counsel noted that Sheppard had since been reassigned to a new probation officer.

Four days later, on September 29, 2020, the District Court – without holding an evidentiary hearing, but "[h]aving reviewed all of the facts, circumstances and arguments-presented" – denied Sheppard's motion. J.A. 6. While recognizing that "[t]he purpose of supervised release is to assist [Sheppard] in transitioning to community life," the District Court concluded that Sheppard "offer[ed] no persuasive explanation for why the purported misconduct of his former probation officer makes him less amenable to, or needful of, such assistance." J.A. 5. Rather, the District Court found that Sheppard's argument as to the effect of the probation officer's misconduct on his rehabilitation "undermine[d]" his motion. *See*

8

J.A. 5 ("In fact, defense counsel's only non-metaphysical argument actually *undermines* the request for early termination. *Compare* Doc. 289 in 13-278 at 1 (indicating that Defendant's therapist would testify 'as to how Defendant's rehabilitation has been burdened by his [former] probation officer's conduct') *with* Judgment in 13-278 (Doc. 239) at pg. 5 (recognizing Defendant's need for mental health monitoring and treatment, having imposed it as a condition of supervised release)."). Sheppard timely appeals.

## II.

The District Court exercised jurisdiction under 18 U.S.C. § 3231. We have jurisdiction to review the District Court's denial of Sheppard's motion for early termination of supervised release pursuant to 28 U.S.C. § 1291.

We review a district court's denial of a motion for early termination of supervised release for abuse of discretion. *See United States v. Melvin*, 978 F.3d 49, 52 (3d Cir. 2020) (citing *United States v. Smith*, 445 F.3d 713, 716 (3d Cir. 2006)). "An abuse of discretion 'can occur if [a district court] fails to apply the proper legal standard[.]'" *Id.* (quoting *United States v. Tomko*, 562 F.3d 558, 565 (3d Cir. 2009) (en banc)). Underlying our review for abuse of discretion are the principles that: 1) a district court may have a "better vantage point than we on the Court of Appeals to assess the matter," *Tomko*, 562 F.3d at 565 (quoting *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004)), and 2) "courts of appeals apply the abuse-of-

9

discretion standard to fact-bound issues that are ill-suited for appellate rule-making," *id.*

## III.

We must decide whether the District Court abused its discretion in denying Sheppard's motion for early termination of supervised release. Based on the following analysis, we will affirm the District Court's ruling. However, in doing so, we recognize the improper nature of the probation officer's conduct and emphasize that the District Court should not have considered the possible effects of the probation officer's misconduct on Sheppard's rehabilitation in its denial of Sheppard's motion.

## A.

"[T]he primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them." *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012) (quoting *United States v. Albertson*, 645 F.3d 191, 197 (3d Cir. 2011)); *see also United States v. Johnson*, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life."). In doing so, supervised release serves as a means of rehabilitation. *Johnson*, 529 U.S. at 59 ("Supervised release fulfills rehabilitative ends, distinct from those served by incarceration."); *see also* S. Rep. No. 98-225 (1983) (indicating that the "primary goal" of supervised release includes "provid[ing] rehabilitation to a defendant who has spent a fairly short period

10

in prison for punishment or other purposes but still needs supervision and training programs after release"); *cf. United States v. Carter*, 730 F.3d 187, 196 n.3 (3d Cir. 2013) (McKee, J., concurring) ("The reason that courts need to be concerned with an offender's successful reentry into society is clear; it is beyond dispute that the vast majority of all offenders sentenced to prison will one day be released back into the community.").

Complementary to its statutorily granted authority to sentence a defendant to a term of supervised release, a district court may also cut short a defendant's term of supervised release. *See* 18 U.S.C. § 3583(e). As relevant, § 3583(e) provides that:

> The court may, after considering the factors set forth in [18 U.S.C. §§] 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)[,] terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the *conduct of the defendant* released and *the interest of justice*[.]

11

(emphasis added). The cited § 3553(a) factors include the following:

> (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the need to afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide him with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentence and sentencing range established for the defendant's crimes; (4) pertinent policy statements issued by the United States Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense.

*Melvin*, 978 F.3d at 52 (quoting *United States v. Davies*, 746 F. App'x 86, 88-89 (3d Cir. 2018)). A district court need not make specific findings of fact for each factor. *See id.* at 52-53.

Rather, when denying a defendant's motion for early termination of supervised release, as relevant here, "a statement that [it] has considered the statutory factors is sufficient." *Id.* (citing *United States v. Gammarano*, 321 F.3d 311, 315-16 (2d Cir. 2003)).  Additionally, Congress's inclusion of the "expansive phrases 'conduct of the defendant' and 'interest of justice' [in § 3583(e)] make clear that a district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination."  *Id.* at 52 (citing *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014)).

**B.**

**1.**

As an initial matter, we address Sheppard's argument that the District Court abused its discretion in failing to cite to the relevant § 3553(a) factors in its order.  Sheppard urges us to hold that the District Court's failure to include "any statement that it considered the 18 U.S.C. § 3553(a) factors as required by *Melvin*" amounts to an abuse of discretion.  Appellant's Br. 10 (citing *Melvin*, 978 F.3d at 51-52).  In making this argument, Sheppard seemingly reads *Melvin* to require a district court to include, by name – "§ 3553(a)" – in its order for it to have considered the § 3553(a) factors.  *See id*. at 8, 10.  This is a misreading of *Melvin*.

In *Melvin*, the Court held that it is "sufficient" for a district court to include a statement that it considered the § 3553(a) factors in its analysis – nowhere in *Melvin* do we

13

indicate that such a statement is, as Sheppard contends, "necessary," or that such statement must mention § 3553(a) by name. *Compare Melvin*, 978 F.3d at 52-53 ("District courts are not required to make specific findings of fact with respect to each of these factors; rather, 'a statement that [the district court] has considered the statutory factors is *sufficient*.'" (emphasis added) (citing *Gammarano*, 321 F.3d at 315-16 (noting that a district court need not expressly reference "§ 3553(a)" to acknowledge its consideration of the statutory factors))) *with* Reply Br. 5 ("[A] statement that the court considered the statutory factors is *sufficient and necessary* to satisfy that requirement regardless of whether the court ultimately grants or denies the motion." (emphasis added)). This is not to say that a district court can deny a motion for early termination of supervised release without any indication in its order that it applied the proper legal standard. It is simply that we leave it to the district court to determine how it wants to convey that it considered the relevant § 3553(a) factors in making its determination. *Melvin* provides one option: for the district court to include a statement that it has considered the relevant § 3553(a) factors. 978 F.3d at 53. But a district court has other options: it may make specific findings of fact for each factor (although, per *Melvin*, it is not necessary to do so), expressly indicate that it considered the relevant factors under "§ 3553(a)," or otherwise make clear in some form that it applied the proper legal standard.[5] *See, e.g.*, *Gammarano*, 321 F.3d at 316 (holding that

---

[5] The Government argues that, in denying a motion for early termination of supervised release, a district court need not

14

a transcript of a district court's hearing on a motion for early termination "clear[ly]" indicated that it "properly considered the factors relevant to this case before denying [the defendant's] motion").

Here, the District Court stated that it "reviewed all of the facts, circumstances and arguments-presented" in reaching its decision to deny Sheppard's motion. J.A. 6. Given that Sheppard's motion addressed the legal standard under § 3583(e) and included arguments as to how the District Court should analyze the relevant § 3553(a) factors, this statement alone is "sufficient" under *Melvin* to indicate that it "considered the statutory factors." *Melvin*, 978 F.3d at 53; J.A. 11-14. To be sure, good practice likely dictates that a district court cite the relevant statute by name in its order. But such an express citation is not necessary, if the district court otherwise demonstrates that it applied the proper legal standard.

_____

consider the relevant factors under § 3553(a) and instead may exercise its discretion in considering whether "such action is warranted by the conduct of the defendant released and the interest of justice." Appellee's Br. 11-12 (citing § 3583(e)(1)). According to the Government, § 3583(e) "requires the court to consider the § 3553(a) factors only before *terminating* release, not before *denying* termination." *Id.* Given the straightforward application of *Melvin* to this case – along with the District Court's indication that it relied on the relevant § 3553(a) factors in reaching its decision – we need not address the Government's argument here.

## 2.

Next, we consider Sheppard's primary argument: that the District Court abused its discretion in denying his motion for early termination of supervised release. Sheppard claims that it was an abuse of discretion for the District Court to deny his motion without considering "whether further supervision would impair [his] rehabilitation." Appellant's Br. 11. Sheppard's argument centers on the detrimental effect of his probation officer's alleged "egregious conduct" on his rehabilitation.[6] *Id.* at 13. He suggests that, in the "interest of justice," the District Court should cut short his term of supervised release because the probation officer's alleged misconduct has caused him to "distrust" the probation office, hindered his ability to "transition into the community," threatened his confidence in the court system, and otherwise left him "without a remedy to right the wrong committed by the probation officer or to deter future bad conduct from the probation office." Appellant's Br. 8, 11-13.

At the outset, we recognize that the District Court did not fail to consider the effect of the probation officer's alleged misconduct. The District Court focused the majority of its

---

[6] To the extent that Sheppard suggests that the District Court abused its discretion in failing to consider how other circumstances, not related to the probation officer's conduct, would "impair" his rehabilitation, *see, e.g.*, Appellant's Br. 8, 13; J.A. 12, we agree with the Government that those arguments are "undeveloped and unconvincing," Appellee's Br. 14 n.4.

decision on addressing Sheppard's rehabilitation argument. It found that Sheppard "offer[ed] no persuasive explanation for why the purported misconduct of his former probation officer makes him less amenable to, or needful of, such assistance." J.A. 5. Recognizing that the District Court is at a "better vantage point" to evaluate the extent to which the probation officer's alleged misconduct impaired Sheppard's rehabilitation, and enjoys considerable discretion in determining whether the "conduct of the defendant" and "interest of justice" warrant early termination, we hold that it was within the District Court's discretion to conclude that "the one thing (the probation officer's alleged misconduct) has little to do with the other (whether [Sheppard] should continue under the supervision of a different officer)." *See* J.A. 5; *Tomko*, 562 F.3d at 565; *Melvin*, 978 F.3d at 52. The District Court did not abuse its discretion in denying Sheppard's motion for early termination of supervised release.

However, in reaching this holding, we highlight the unique – and concerning – circumstances of this case, and recognize a faulty, yet not determinative, premise in the District Court's reasoning. If Sheppard's allegations concerning the behavior of his probation officer are true, the "personal relationship" that his probation officer formed with his then girlfriend is indeed, as Sheppard claims, "egregious" and "extraordinarily offensive." Appellant's Br. 12. Reviewing the alleged text messages exchanged between Sheppard's probation officer and his then girlfriend, these communications were intimate in nature; they conveyed personal information about the

17

probation officer's romantic life, his former paramour's feelings toward him, and his marital and extra-marital relationships. As Sheppard notes, these alleged communications did not involve him, "his rehabilitation, or the detrimental effect the secret relationship would have on [his] rehabilitation." Appellant's Br. 5-6.

A probation officer's communications of such a "personal" nature with an assigned defendant's significant other are not only entirely inappropriate and unprofessional, but they also undermine the primary objective of supervised release – *i.e.*, "to facilitate the integration of offenders back into the community rather than to punish them." *Murray*, 692 F.3d at 280 (quoting *Albertson*, 645 F.3d at 197). It also challenges the role of probation officers as trusted government officials who, in performing their duties, are "supposed to have in mind the welfare of the probationer." *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987); *see United States v. Lifshitz*, 369 F.3d 173, 180 (2d Cir. 2004). In Sheppard's case, his probation officer implicated Sheppard's personal life in his own – and to such a degree that, according to Sheppard, it caused him to break up with his live-in girlfriend, with whom he considered to be in a "lifelong commitment." J.A. 11. If this is not the antithesis to assisting Sheppard in transitioning back into the community, and having his "welfare" in mind, we do not know what is.[7]

---

[7] Additionally, we note that the probation officer's alleged suggestion to Sheppard's girlfriend that his job requires a "tolerance for bullshit" is likewise entirely inappropriate and

The District Court indicated as much in its order, and it acknowledged that the probation officer's alleged conduct was "unfortunate." J.A. 5. Yet it found that Sheppard's "only non-metaphysical argument" – *i.e.*, "how [Sheppard's] rehabilitation has been burdened by his [former] probation officer's conduct" – "actually *undermines*" his motion for early termination, given his "need for mental health monitoring and treatment, having imposed it as a condition of supervised release." J.A. 5. We agree with Sheppard that the District Court's reasoning suggests that he may "require further mental health treatment, even if [he] does not need it, because of the probation officer's offensive conduct." Reply Br. 7-8. In other words, the District Court's order includes an inference that Sheppard is responsible not only for his own conduct, but also must shoulder any and all negative repercussions from the misconduct of his probation officer. This inference is improper.

It cannot be clearer: when evaluating a motion for early termination, a district court, particularly in the absence of holding an evidentiary hearing, may not impute a probation officer's alleged improper actions to a defendant serving a term of supervised release, so as to justify continued (or additional) rehabilitative oversight. Any suggestion otherwise essentially writes § 3583(e)'s mechanism for early termination of supervised release out of a defendant's toolkit, and it would leave

unprofessional. J.A. 41. It not only conveys a disregard for the welfare of Sheppard, but it also undermines the integrity of the United States Probation Office's administration of supervised release.

19

the strength of a defendant's § 3583(e) motion dependent upon the behavior and conduct of the assigned probation officer. While we do not reach Sheppard's arguments that his early termination of supervised release is essential to "right the wrong committed by the probation officer" and "deter future bad conduct from the probation office," Appellant's Br. 8, we recognize that imputing a probation officer's misconduct to a defendant places the defendant in a vulnerable position – not just in terms of seeking relief for the probation officer's misconduct, but also as to the defendant's welfare and ability to integrate into the community.

To be sure, it was within the District Court's discretion to find that the probation officer's alleged misconduct "ha[d] little to do with" the merits of Sheppard's motion and the underlying circumstances of his case. J.A. 5. And it may be so that Sheppard will require additional rehabilitative oversight, such as further mental health treatment, as a result of the probation officer's alleged misconduct. However, the District Court, in denying his motion, should not have considered the possible effects of the probation officer's misconduct on Sheppard's rehabilitation.

## IV.

For these reasons, we will affirm the order of the District Court denying Sheppard's motion for early termination of supervised release.